E. H. Perry & Company v. J. H. Langbehn.

No. 3119. Decided May 30, 1923.

(252 S. W., 472).

1.—Contract—Carriage of Goods—Construction.

The bill of lading for transportation of cotton by ship from Galveston to Genoa constituted the contract between the parties in the absence of other agreement. Where based on a previous written contract between shipper and carrier, (a "cotton freight engagement note") by which the transportation was to be subject to the conditions of the form of ocean bill of lading used by the vessel, the two agreements constituted one contract and were to be so construed. (Pp. 79, 80).

2.—Same.

All the provisions of two written agreements constituting one contract must be considered in determining its cause and effect; its general intent and purpose should control minor inharmonious provisions; where the contract was peculiar to a certain business (cotton export trade) indefinite or inconsistent terms should be interpreted in the light of the custom of the business and the construction placed upon it by the parties. (Pp. 81, 82).

3.—Same—Room from Transportation by Ship.

A "cotton freight engagement note" securing the shipper at a named price for ocean transportation to Europe, "room for 3000 bales of standard compressed cotton," is held, under the evidence bearing on its construction and intent here considered, to be an undertaking for the transportation of the number of bales named, and not for space on the vessel for its voyage for such quantity in the form of "standard" compressed bales. (Pp. 76-82).

4.—Same—Space on Ship—Recompressed Cotton.

The carrier by ship having transported the shipper's cotton to its destination without injury, was not liable to the shipper under the contracts

and evidence as to their interpretation here considered, for the profit made by recompressing such cotton by the "Webb" process, so as to occupy less space than "standard compressed," and carrying other freight in the space so saved. (Pp. 82, 83).

### 5.—Same—Contract—Novation.

Though the original agreement for the ocean transportation of cotton should be held one for a definite space on the vessel required for so many "standard" compressed bales, the act of the shipper after learning that the carrier had recompressed the cotton so as to occupy less space, in accepting a bill of lading, not for space on shipboard, but for transportation of the named quantity of cotton, converted the contract to one for transportation and not for space. (P. 82).

### 6.—Same—Case Stated.

A shipper and an ocean carrier contracted to secure the former room on the vessel for "3000 bales of standard compressed cotton from Galveston to Genoa," subject to conditions contained in the form of ocean bill of lading used by the vessel. The carrier recompressed the cotton shipped so as to occupy less space, and the shipper, learning thereof, notified the carrier that it would be held liable for any damage to the cotton caused by such recompressing, but of no claim by reason of reduction in space, and accepted a bill of lading calling only for transportation of the cotton, not for certain room on the ship. No damage appeared to have been caused by the recompressing, and the cotton was duly transported, delivered, and paid for. By use of the room on the vessel gained by the recompressing the vessel made a large profit in carrying other freight. *Held* that it was not liable therefor to the shipper of the recompressed cotton. (Pp. 76-83).

Questions certified from the Court of Civil Appeals for the First District, in an appeal from Galveston County.

This case appears to have been first affirmed by the Court of Civil Appeals for the First District, with a dissenting opinion by Chief Justice Pleasants. The questions here discussed being certified to the Supreme Court and by them referred to the Commission of Appeals, Section B, the opinion rendered by that body was in accordance with the dissent, treating the contract as one for space and holding defendant liable, but this was not adopted and the Supreme Court, withdrawing the case from the Commission, rendered the answer here given to the questions certified.

*Brooks, Hart & Woodward* and *Lewis Fisher*, for appellant.

The court erred in peremptorily instructing the jury to return a verdict for the defendant, because there was evidence introduced which would have warranted a verdict in favor of the plaintiff, said evidence being in substance to the effect that the action of defendant in Webb-pressing a portion of the plaintiff's cotton was wrongful and that defendant by said wrongful action was enabled to store and ship on the steamship Kaupanger additional cargo, for which he received pay and thereby realized a pecuniary benefit directly

and proximately because of his wrongful action in Webb-pressing plaintiff's cotton and thereby creating additional space in his said vessel for additional cargo. Joske v. Irvine, 91 Texas, 582; Bonn v. Galveston, Etc., Ry. Co., 82 S. W., 808; Ingram v. Posey, 138 S. W., 421; Terry v. Munger, 121 N. Y., 161; Efron v. Stees, 129 N. W., 374; McSorley v. Faulkner, 18 N. Y. Supp., 469; Braithwaite v. Akin, 3 N. D., 365; Norden v. Jones, 33 Wis., 600; Fanson v. Linsley, 20 Kans., 239; Berly v. Taylor, 5 Hill, 583; Fratt v. Clark, 12 Cal., 89; Hambly v. Trott, Cowp., 371; Woodward, Quasi Contracts, Ch. XX; Keener, Quasi Contracts, Ch. III; 2 Street, Foundations of Legal Liability, 218; 3 Street, Foundations of Legal Liability, 199; Putnam v. Wise, 1 Hill (N. Y.) 240, and notes; Berly v. Taylor, 5 Hill (N. Y.), 584; Gordan v. Bruner, 49 Mo., 570; Stockett v. Watkins, 2 Gill & Johnson's (Md.) 326; Pomeroy's Civil Remedies, Secs. 567 and 574.

The court erred in instructing the jury to return a verdict for the defendant against plaintiff upon first count relating to the wrongful Webb-pressing of said 2500 bales of cotton, because the evidence introduced upon trial showed that defendant benefited by the commission of said torts against the property of plaintiff in that six cubic feet of space per bale was saved to defendant by his wrongful Webb-pressing of plaintiff's cotton, making an aggregate of 15,000 cubic feet of space so saved by defendant as a result of his tort, in which space defendant stowed and shipped 750 bales of cotton of the average weight of 500 pounds each, for which he received freight at the rate of $2.75 per hundred-weight. Same authorities.

The court erred in instructing the jury to return a verdict for the defendant upon the first count in plaintiff's second amended original petition, being the count complaining of the wrongful Webb-pressing of plaintiff's cotton, for the reason that the evidence introduced upon trial shows that such Webb-pressing was unauthorized and that it constituted a wrongful and tortious trespass upon plaintiff's property by defendant. Same authorities, and in addition thereto the following: Fort Worth, Etc., Ry. Co. v. McAnulty, 26 S. W., 414; Shipman Com. Law Pleading, 2 Ed., 62; Story on Bailments, Sec. 589b (8 ed.), p. 577; 5 Cyc., 178 (Bailments); 3 Bouvier's Law Dict., Rawle's 3rd Rev., p. 3316, and cases.

In construing a contract the grammatical and ordinary sense of the words used is to be adhered to, unless that would lead to some manifest absurdity or some repugnance or some inconsistency. G. C. & S. F. Ry. Co. v. State, 97 Texas, 274; Close v. Browne (Ill.), 82 N. E., 629; 13 L. R. A., N. S. 634; 6 R. C. L., p. 842.

It appearing from the pleadings and facts stated in the certificate that defendant converted plaintiff's property to his own use and that, as a result of the commission by him of such tort, he received

benefits, plaintiff had the right to waive its tort action for damages and maintain the action brought by it against defendant for the recovery of such benefits. Authorities first above cited.

*Stewart, De Lange & Milheiser,* for appellee.

The contract sued upon was a mere contract to transport 2500 bales of cotton from Galveston to Genoa, and not a contract to furnish or sell to appellant cubic space, and it being conceded that the 2500 bales were so transported, the appellee has performed the contract in its entirety.

There was no wrongful or tortious conversion of the appellant's property by appellee, the act of the appellee in compressing such cotton being well known to and ratified by appellant prior to and at the time of merging the contract for transportation in the final and ultimate contract between the parties evidenced by the bills of lading for the carriage of the cotton from Galveston to Genoa.

And the Freight Engagement Note expressly provides that the vessel is to issue bills of lading and that such bills of lading are a part of the contract. Bills of lading are not issued for space; they are issued and provide, as the Court knows and the record shows, for carriage of goods.

An answer to Question No. 1 to the effect that the Freight Engagement Note sued upon created a contract of affreightment or transportation and not a sale of space, would require a negative answer to the second question. For such an answer to the first question would determine that the space in the vessel from the sale of which appellee is alleged to have received a profit belonged to appellee and not the appellant. This would mean that no right in the space was vested in appellant by virtue of express contract.

Most of the cases dealing with action *in assumpsit* will be found collated in Century Digest, Title Action, Sections 196 to 215; and under same title in First and Second Decennial Digests, Key 28. From an examination of such cases, we have been unable to find a single one allowing recovery to plaintiff except where, as in cases cited by appellant, the thing taken by defendant belonged to plaintiff or resulted from use of plaintiff's property. Valuable notes and collation of cases can be found appended to reports of the following cases: Woodruff v. Zaban, 17 Am. & Eng. Ann. Cas., Page 974; Ford v. Atlantic Compress Co., Am. & Eng. Ann. Cas. 1913D, Page 226; Davidson Grocery Co. v. Johnson, Am. & Eng. Ann. Cas. 1915C, Page 1129; Martin v. Hutton, 36 L. R. A. (N. S.) 603; Kyle v. Chester, 37 L. R. A. (N. S.) 230; Roberts v. Moss, 17 L. R. A. (N. S.) 280.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court,

This case is here on certified questions from the Honorable Court of Civil Appeals for the First District.

E. H. Perry & Company, a corporation, cotton exporters, and Langbehn Brothers, shipowners, entered into the agreement shown by the cotton freight engagement note, which reads as follows:

"Cotton Freight Engagement Note.

HLZ            Langbehn Bros., Steamship Agents.            No. 486

Galveston, Texas, March 27, 1916.

"Messrs. E. H. Perry & Co.,

"We beg to confirm your engagement of room for 3000—Three Thousand—Bales of Standard Compressed Cotton from Galveston to Genoa—@ 300 cts. per 100 lbs., basis 100 A1 Tramp—insurance, shipper paying wharfage, per SS Kaupanger (Built 1890) other 100 A1 Steamer; to be shipped from interior on or before ——; to be delivered alongside vessel or at her loading berth on or before May 10th, 1916. Freight to be Paid Through.

"Steamer has option of calling at other port or ports in any order to load and—or discharge coals and—or other cargo and—or passengers. It is understood and agreed that this contract is subject to the Rules of the Marine Committee of the Galveston Cotton Exchange and Board of Trade, extracts from which are printed on back, and all of which are made a part hereof, and on the express understanding that it is subject to all clauses and conditions contained in the Ocean Bill of Lading used by the vessel, copies of which will be furnished on application, and said Bill of Lading is made a part of this contract. Prepaid freight will be considered earned, ship or goods lost or not lost.

"Transferred Without Consent of the Steamship Agent.

"Approved and Accepted.

E. H. Perry & Co.,                    Signed in Duplicate,

By K. Schmidt,                       Langbehn Bros.

"Most probably all of these 3000 bales will be shipped by us for account and in name of F. G. Smith & Co."

After the execution of the above, Perry & Company in due time delivered to Langbehn Bros., 2500 bales of Standard compressed cotton for shipment under the terms of said instrument. Thereafter, without the consent of appellant, Langbehn Bros., at their own expense, caused said cotton to be Webb-pressed, a process which reduced the bales in size, and by reason of which Langbehn Bros. saved considerable space in their ship, Kaupanger, which they sold to others for a large sum.

Prior to June 13, 1916, Mr. Zeigler, the ship broker who acted for Perry & Company in making the original contract with Langbehn Bros., and at the time certain changes and modifications (not dis-

closed in the certificate), therein were made, had informed Perry & Company that the cotton had been Webb-pressed.

On June 13th he wrote Perry & Company a long letter with reference to Langbehn's having had the cotton Webb-pressed. It is unnecessary to quote the whole of this letter. It gave appellant full and complete information on the subject of Webb-pressing this cotton. He thought Langbehn had a right to recompress the cotton, but only by the Standard-pressing process. Speaking with reference to Langbehn, he said: "He is taking a chance when he recompresses it by the Webb process, but I dare say the chance is slight, because in my opinion it does not damage the cotton," in view of the slipshod manner in which the Webbing was done. The Court of Civil Appeals in the certificate, with reference to this letter, says: "He said further, however, . . . that he supposed Langbehn was able to pay any damages suffered by the owner, if Langbehn had no right to Webb the cotton." The certificate quotes the letter in part as follows: "The only thing I can see is if there is a claim from the other side for damage on account of webbing, Mr. Langbehn will have to pay the bill."

On the 20th of June, Perry & Company, replying to said letter, said:

"We beg to acknowledge receipt of your favor of the 13th inst. in regard to webbing of our 2500 bales Kaupanger cotton, and meanwhile our Mr. Hopkins has personally investigated the cotton at the pier, and he advises that every bale of this cotton has been webbed. . . .

"Please note that we are writing to our European friends regarding this webbing, and that we reserve the right to make such a claim against Mr. Langbehn as our European friends might see fit, and if you think it advisable, you might inform Mr. Langbehn of the contents of this letter."

Langbehn Bros. were informed of the contents of this reply from Perry & Company shortly after they issued the bill of lading for the cotton, and before the ship cleared. The bill of lading was issued on June 17, 1916, after Perry & Company had been informed that the cotton had been Webb-pressed, was accepted by them, and the cotton permitted to go forward without any protest other than that shown in the letters above referred to. Hopkins, general agent for Perry & Company at Galveston, after he saw that the cotton had been Webb-pressed by Langbehn, took out the bills of lading for its shipment and cleared the cotton through the custom-house on June 22d.

Portions of the bill of lading are shown in the supplemental certificate of the Court of Civil Appeals. We deem it unnecessary to quote therefrom. It is clearly a bill of lading for cotton, to be de-

livered to a designated consignee at the port of Genoa, upon surrender of the bill and payment of the freight at $3 per hundred pounds,—at which point the carrier's responsibility ceases. All clauses in the bill of lading clearly show that it was issued for goods (in this instance cotton), and its terms are only consistent with a shipment of goods. It contains no reference in any manner, so far as we are able to ascertain, to "space" or "room". Evidently it was an ordinary ocean bill of lading for the shipment of cotton, and in no sense had reference to the leasing or chartering of space in a vessel.

After the bills of lading were issued, Perry & Company attached them to drafts, and sold them to a certain bank. Hopkins, their general agent at Galveston, testified that after the sale of the bills of lading to the bank, everything they represented belonged to the other party, and not to Perry & Company, and that no claim had been made by any one against Perry & Company for any kind of damage by reason of the recompressing of the cotton by Langbehn Bros. In the recompressing process the marks on the cotton were not obliterated or damaged, and the cotton shipped was the same cotton as that delivered to Langbehn Bros.; and, so far as this witness knew, every bale reached its destination.

The basis of appellant's action is that Langbehn by Webb-pressing the cotton was enabled to load it into a smaller space in the vessel than it otherwise would have occupied; that the space thus saved, although the property of Perry & Company, was sold by Langbehn to other parties, for which he received $18,345.

Appellant did not sue for damages suffered by reason of the recompressing of its cotton. It waived its action for damages, and elected to sue for the profits or gains above specified. In fact, there was no evidence showing that appellant suffered any loss by reason of the recompressing of the cotton. The uncontradicted evidence shows that appellant had sold the cotton to parties in Genoa; that it was delivered, and appellant fully paid therefor without any claim for rebate or damages.

The appellee, Langbehn, contended that the cotton when delivered to him was in bad order; that he was compelled to recompress it to a higher density in order to put it in a proper condition for shipment,—which was done without damage to appellant; and that under the custom of the port of Galveston the terms of the contract hereinbefore set out were for transportation of the cotton. and not for a given space in the vessel.

Zeigler and Merrow were the only witnesses who testified directly as to the general interpretation put upon the language of the contract in issue here by those engaged in the business to which the

contract relates. These witnesses were familiar with contracts of the character here involved, and the usage and custom of the cotton shipping trade at Galveston. The effect of their testimony is that the expression used in the freight engagement note of "room" for a given number of bales of cotton, is considered a contract for carriage of the cotton, and not a reservation of any particular quantity of space in the vessel. Merrow expressly so testified; and Zeigler. who represented Perry & Company in making the contract in issue, said that the freight engagement note in question is not an ironclad agreement to take so much space on a ship; that that was not what he was talking about when he was talking to Langbehn Bros., *but was only making an engagement for the shipment of so many bales of cotton.*

After hearing all the evidence, the trial court instructed a verdict for appellee.

The foregoing shows what we deem the essential facts, abbreviated to some extent, shown in the certificate.

On this record the following questions are certified to us:

"Question One. Under the pleadings and facts above stated, was the contract between the parties a contract for such space in the ship as 3000 bales of Standard compressed cotton would cover, or was it a contract only for transportation of said cotton from Galveston, Texas, to Genoa, Italy?

"Question Two. Independent of whether or not the contract between the parties was for such space as 3000 bales of cotton would cover or occupy, was appellee liable to appellant for such profits as he received for the sale of the space saved in said ship by reason of the re-compressing of appellant's cotton?"

The bill of lading in this case issued for 2500 bales of cotton, and in the absence of the freight engagement note would have constituted the contract between the parties. 36 Cyc., pp. 213, 214; Elliott on Contracts, Vol. 4, Sec. 3160; The Thames v. Seaman, 14 Wallace (U. S.), pp. 98, 105, 20 L. Ed., 804; Ryan & Co. v. Missouri K. & T. Ry. Co., 65 Texas, 14, 17, 57 Am. Rep., 589; Schloss v. Atchison, T. & S. F. Ry. Co., 85 Texas, 601, 602, 22 S. W., 1014; Montague v. Hyde, 82 Fed., 681. However, since the freight engagement note made the bill of lading part of the contract, the two are to be considered together as constituting the contract actually executed and acted upon. Page on Contracts, Vol. 2, Secs. 1115, 1116; Williston on Contracts, Vol. 1, Secs. 581, 582, 583; 36 Cyc., pp. 65, 212, 213; O'Connell v. 1002 Bales of Cotton, 75 Fed., 408; see also 4th Michie's Digest, p. 597.

Contracts of the character before us are to be construed as any other class of contracts. The intent of the parties is to be sought, and when found is to be made effectual, if possible. A liberal con-

struction is to be given in furtherance of the real intention of the parties, and all provisions must be taken into consideration in determining the scope and effect of the contract as a whole. If inharmonious provisions are found, its general intent and leading purpose should control minor provisions. 36 Cyc., pp. 62, 64, 206, 213; Hearne v. Gillett, 62 Texas, 23, 26; Knapp v. Patterson, 99 Texas, 400, 90 S. W., 163; Moore v. Waco, 85 Texas, 206, 211, 20 S. W., 61.

Not only are we to construe this contract as a whole, but since it is one peculiar to the cotton export trade, and somewhat indefinite or inconsistent in its terms, we may interpret it in the light of the custom of the business, and the construction placed upon it by the parties themselves. Page on Contracts, Vol. 2, Sec. 1126; Williston on Contracts, Vol. 2, Sec. 623; Elliott on Contracts, Vol. 2, Secs. 1705, 1706, 1707; Williams v. Arnis, 30 Texas, 37, 48; Galveston, H. & S. A. Ry. Co. v. Johnson, 74 Texas, 256, 263, 11 S. W., 1113.

We are of the opinion that the freight engagement note was not a contract for space or room in the ship, but was one exclusively for the shipment of cotton. The *"room,"* referred to in the note was merely an incidental term used to make an engagement for the shipment of the cotton. The clause ''3000 bales of Standard compressed cotton from Galveston to Genoa'', was not placed in the note as the measuring-rod or descriptive term by which the amount of shipspace contracted for was to be determined.

The title of the initial instrument describes the document. It is named a *"Cotton Freight Engagement Note"*, and not a 'space or room engagement note'. The title, like every other portion of a contract, may be looked to in determining its meaning. See Finch v. Trent, 3 Texas Civ. App., 568, 24 S. W., 679. In fact, the purpose of giving a person or thing a name is to distinguish that person, or thing or class from others. Words and Phrases (2d Series) Vol. 3, p. 516. The reason for designating the document before us as a ''Cotton Freight Engagement Note'', was no doubt to indicate its object, and distinguish it from other classes of maritime contracts.

Appellant was engaged in the cotton export business, and the contract in issue was made in pursuit of this business. The engagement note shows that 3000 bales of cotton were to be delivered at shipside, to be shipped by a particular ship, with a specified freight rate per hundred pounds, to be paid through. In other words, the shipment of the cotton was plainly the purpose of the engagement note; and, in fact, cotton was shipped. The bill of lading was for cotton, and its various clauses are consistent only with the shipment of cotton.

That the contract was for the shipment of freight, and not for the lease or sale of space, is likewise clearly shown from the acts of the parties themselves. Appellant before the cotton was loaded, and

before it accepted and negotiated the bill of lading, knew that appellee had Webb-pressed the cotton. The only claim or contention then made by appellant was that it reserved the right to make a claim against Langbehn on behalf of the consignees of the cotton, if the latter made any claim.

As shown by the statement of the case, Mr. Zeigler was of the opinion that the only result of the Webb-pressing of the cotton by Langbehn was the possible injury to the cotton, and a claim for damages from the consignees on account thereof. Such a thing as a claim on the part of appellant for the space saved by this process did not arise in his mind. This position was concurred in by appellant in its letter in reply to that of Mr. Zeigler; that is, appellant, after having been fully advised as to the facts, requested Mr. Zeigler to inform Langbehn that appellant reserved the right to make a claim against Langbehn, if the consignees of the cotton saw fit to make a claim for damages to the cotton. Such a thing as a claim based upon the sale of space in the vessel, such as is here insisted on, never arose in the mind of appellant at the time. Clearly, there was nothing in Zeigler's mind, nor in that of appellant, that a contract for space had been breached in any manner by Langbehn.

Mr. Hopkins, the general agent of Perry & Company at Galveston, took out the bill of lading for the 2500 bales of cotton after it had been Webb-pressed, and cleared it at the custom-house; showing definitely that, as the agent of Perry & Company, he thought that Langbehn was complying with the contract, except in so far as damages might accrue in favor of the consignees of the cotton by reason of the injurious effect of the Webb-pressing process. It never occurred to him that Perry & Company had bought space in the vessel, instead of having made a contract of affreightment for the cotton. As a matter of fact, the cotton was not injured, and no claim was ever made, either to Perry & Company or against Langbehn Bros., because of the re-compressing process. The fact that Perry & Company made no claim for space in the boat; that it accepted the bill of lading for the Webb-pressed cotton, and continued with the contract, as evidenced by the bill of lading, after the cotton had been Webb-pressed, shows clearly that the purpose of the engagement note and the bill of lading was to ship cotton, and not to purchase space in the boat.

It is familiar law that where a contract is ambiguous in its terms, a construction given it by the parties thereto and by their actions thereunder, before any controversy has arisen as to its meaning, with knowledge of its terms, will, when reasonable, be adopted and enforced by the courts. Elliott on Contracts, Vol. 2, Secs. 1537, 1538; Galveston, H. & S. A. Ry. Co. v. Johnson, 74 Texas, 256, 263, 11 S. W., 1113; and authorities supra.

113 Tex.—6.

The cotton engagement note appears to be a type of contract more or less peculiar to the cotton trade, but one in general use at Galveston. The testimony of Zeigler and Merrow, as set out above, as to the meaning of this character of instrument in the cotton trade at Galveston, shows that such contract is one for the shipment of cotton, and not for the lease or rental of space in a boat, measured by the number of bales specified. In fact, Zeigler, who acted for Perry & Company in the matter, testified that when he made the original agreement, he was only making an engagement for the shipment of so many bales of cotton.

However, considering the original engagement note as in reality a contract for "room" or "space" for 3000 bales of Standard-pressed cotton, the result to appellant in this litigation is the same.

When we come to consider all the facts, and construe the engagement note and bill of lading together as the evidence of one contract, we find that the bill of lading was issued and accepted for 2500 bales after appellant knew the cotton had been Webb-pressed, and that the space which would then be occupied by it would be less than had it remained Standard-pressed. The acceptance of the bill of lading under these conditions as to the terms of the bill of lading clearly made a contract binding on appellant as well as appellee. 36 Cyc., pp. 213, 214; Schloss v. Atchison, T. & S. F. Ry. Co., 85 Texas, 601, 602, 22 S. W., 1014; and other authorities supra. We think the partial contract evidenced by the engagement note merged into, and to the extent of all inconsistencies was superseded by, the completed contract evidenced by that note and the bill of lading issued and made a part thereof; that is, the terms of the engagement note providing for "room" for 3000 bales of Standard-pressed cotton were modified by the issuance and acceptance of the bill of lading for 2500 bales of Webb-pressed cotton, and the latter controls. Elliott on Contracts, Vol. 3, Sec. 1866; 36 Cyc., p. 60; Boyd v. Moses, 7 Wallace (U. S.), 316; The Donald, 115 Fed., 744, 747; Wheeler v. Curtis, 11 Wend. (N. Y.), 654, 664.

Therefore, construing the contract as a whole, considering the engagement note as modified by the bill of lading, and interpreting the two according to the acts of the parties, it is entirely clear that the actual completed contract entered into was for the shipment, or "space" for the shipment, of 2500 bales of Webb-pressed cotton, instead of 3000 bales of Standard-pressed cotton, and that this contract was in all respects carried out without injury or damage to appellant.

It has been heretofore noted that appellant has not sued for damages suffered by reason of the re-compressing of its cotton. Nor was it damaged. Appellant sold the cotton to parties in Genoa, and was paid therefor. If it be said that the act of Webb-pressing the cotton was a trespass, it was one without injury and without any dam-

ages. Besides, since appellant occupied all the space in the ship for which it in reality contracted, it is not entitled to any profits which appellee may have made by sale of the space saved by Webb-pressing the cotton.

To the first question we answer that the contract in question was only for transportation of cotton from Galveston, Texas, to Genoa, Italy, and not for so much space in the ship.

To the second question we answer that appellee was not liable to appellant for such profits as he received for the sale of space saved in the ship by reason of the re-compressing of appellant's cotton.