**J. D. AMEND, Individually and Amarillo National Bank, As Trustee of the James Edward Amend Trust, Appellants,**

**v.**

**A. C. LIGHT, Jr., Appellee.**

**No. 7955.**

Court of Civil Appeals of Texas.

Amarillo.

June 30, 1969.

Rehearing Denied July 28, 1969.

Richards & Ferguson and Robert C. Ferguson, Dalhart, for appellants.

Day, Owen & Lyle and Gene V. Owen, Plainview, for appellee.

NORTHCUTT, Justice.

On May 18, 1964, J. D. Amend, acting for himself and the Amarillo National Bank, Trustee for the "James Edward Amend Trust" leased to A. C. Light for a term of three years ending after the wheat crop was harvested in 1967 Sections Two (2) and Twelve (12), Block 3, G.H. & H. Survey in Sherman and Hansford Counties, Texas and Sections 16 and 75 in Block 3T., T. & N.O. Survey in Sherman County, Texas. That portion of the lease here involved is as follows:

"J. D. Amend, acting for himself and the Amarillo National Bank, Trustee for the 'JAMES EDWARD AMEND TRUST' does hereby lease to A. C. Light, for a cash consideration of $38,-000.00 per year, the following described real estate:

Sections Two (2) and Twelve (12), Block 3, G.H. & H. Survey, in Sherman and Hansford Counties, Texas; and Sections Sixteen (16) and Seventy-five (75) in Block 3T, T. & N.O. Survey, in Sherman County, Texas.

The cash payments will be made in the manner as set forth below:

Ten Thousand Dollars ($10,000.00) is to be paid by A. C. Light to J. D. Amend on this the 18th day of May, 1964, and an additional $10,000.00 every six months as long as this lease is in force. If one-third (1/3) the market value of all crops produced for any given year is less than $38,000.00, the amount of money to be paid by A. C. Light is to be reduced. The balance of the lease money is to be paid at the time the crops are harvested. When the milo crop is harvested, if the yield per acre at the prevailing price is not sufficient to justify the average cash price per acre determined by the value of one-third (1/3) of the market value of the average per acre then the total amount of the cash lease will be reduced to come within one-third of the total value of all crops produced. A like procedure will be followed in determining any adjustment necessary when the wheat crop is harvested. To be more specific, let's say that A. C. Light plants and harvests eight hundred acres of milo for harvest in 1964. The cash lease value based on the $38,000.00 total is about $22.00 per acre and if the value of one-third of the actual milo produced per acre is less than $22.00 then the amount to be paid by A. C. Light is to be regulated accordingly. The $10,000.00 payment due in November of 1964 shall be made by A. C. Light when due and will be deducted from the milo payment. The $10,000.00 payment due May 18, 1965 shall be made by A. C. Light when due and shall be deducted from the wheat payment when made at the time of the 1965 wheat harvest, and this procedure is to continue on such basis until the agreement is terminated. Since this agreement covers the production of both wheat and milo as well as other possible crops and since most cash leases are payable in

advance, the $10,000.00 paid by A. C. Light on May 18, 1964 shall be deducted from the settlement of the last crop harvested under the terms of this agreement.

A. C. Light has the option of retaining all the wheat pasture for his own use and in case he does, the prevailing price of the wheat pasture will be taken into consideration in determining the per acre value of the wheat crop. Otherwise the wheat pasture will be used jointly by J. D. Amend and A. C. Light.

This lease can be changed by the mutual consent of both parties concerned and will be should the anticipated irrigation development fail to materialize as scheduled. J. D. Amend is to drill the necessary irrigation wells and A. C. Light is to furnish the motors. Repair to the irrigation pumps is to be made by J. D. Amend unless the damage is due to neglect by A. C. Light or his help. The lease on Section 75 is contingent on A. C. Light buying at least a one-half (½) interest in the 120 head of yearlings being placed on said Section 75.

To make sure that the cash value of the crops actually produced does not fall below the amount involved under the terms of this lease due to hail damage, J. D. Amend has the right to instruct A. C. Light to place hail insurance on the growing crops to the extent of a minimum of $22.00 per acre, the approximate amount of the cash lease. The premiums are to be deducted from the payments made to J. D. Amend by A. C. Light to the extent of the amounts due on the $22.00 coverage. This provision is made because J. D. Amend could not carry this insurance himself since he has no actual interest in the crops.

This agreement can be changed at any time by mutual agreement of both parties concerned and can also be changed to a share basis whereby J. D. Amend is to receive one-third (⅓) of all cash crops delivered to him in the nearest elevator or in the case of hay crops, at a point designated on Section 75 by J. D. Amend. In case this lease is converted into a share arrangement, J. D. Amend is to pay for ⅓ of all fertilizer used on said land.

A. C. Light agrees to farm this land in a workmanlike manner and use sufficient amounts of fertilizer to insure good yields and returns.

J. D. Amend and A. C. Light will participate equally in livestock operations if A. C. Light elects to convert part of the farm land to crops to be used for the production of livestock. The acreage used for such production will be taken out of the $38,000.00 price deal at an average cost per acre of approximately $22.00 and J. D. Amend will pay A. C. Light one-half (½) of the customary price for the operations necessary to produce these crops. A. C. Light may, if he so elects, pay the $38,000.00 cash lease and use the land as he sees fit as long as nothing is done to damage the land more than normal and as long as the present bases are protected.

This lease may be terminated by either party at the end of one year if it appears that relations cannot be agreeable between the two parties.

Repairs to improvements are to be made by A. C. Light and J. D. Amend is to pay for the materials used."

On May 14, 1965, Amend wrote a letter to Light stating as follows:

"The agreement stated that the lease could be terminated by either party at the end of one year.

This letter is being written to notify you that the lease will be terminated at the earliest possible date. You may proceed with the crops that you have under way but I will expect to receive possession of the land which you do

not have to some grain sorghum crop at the time the 1965 wheat harvest is completed."

Then on June 22, 1966, Amend had served upon Light Notice to Vacate as follows:

"You are hereby notified that the term for which you have held the lands and premises now occupied by you as a tenant farmer, and hereinafter described, has terminated, and I hereby demand immediate possession thereof; said lands and premises being located in Sherman and Hansford Counties, Texas, known and described as follows:

All of Section No. 12, Block 3, G.H. & H. RR Co. Survey in Sherman County, Texas; and all Section No. 2, Block 3, G.H. & H. RR Co. Survey in Sherman and Hansford Counties, Texas, the East one-half (E/2) lying and being situated in Hansford County, Texas and the West one-half (W/2) of said Section No. 2 lying and being situated in Sherman County, Texas; and all of Sections Nos. 16 and 75 in Block 3T, T. & N.O. RR Co. Survey, in Sherman County, Texas.

Unless you comply with this demand for immediate possession of said lands and premises, then we shall take such action as is authorized by law in order to obtain its possession."

It was Light's contention that he received the letter dated May 14, 1965, but that such letter was not effective to terminate the lease, but if he was mistaken in that contention then he contends that such notice of termination and demand for possession was waived verbally and in writing by Amend and that it was agreed the contract was to remain in force on a ⅓ of the crops as rent. Light further pleaded he had gone to great expense in changing the land from dry farming to irrigated land.

This suit was originally filed on July 7, 1966, before the planting of the wheat crop which was harvested in 1967. The first pleadings were for possession of the land and for damages. Light responded with defenses and counterclaims for damages. Light continued in possession of the land and farmed the same until he harvested the wheat crop in 1967, and then delivered possession of the land to Amend. The pleadings were amended and supplemented at various times whereby each of the parties were claiming damages. The case was tried in August, 1968. The case was submitted to a jury upon special issues. In answer to the special issues the jury found as follows:

(1) That the written lease was not terminated by the letter notice dated May 14, 1965;

(2) That Light did not agree to termination of the written lease in accordance with the letter notice;

(3) That Light and Amend mutually maintained the 1966 milo crop, the 1966–67 wheat crop, the 1965 milo crop and the 1965–66 wheat crop each to be controlled by provisions of the written lease dated May 18, 1964;

(4) That the 1965 milo crop, the 1965–66 wheat crop and the 1966 milo crop each were not grown pursuant to an oral agreement to pay ⅓ as rent free and clear of all expenses;

(5) That there was a mutual agreement between the parties for the growing of the 1966 milo crop and the 1966–67 wheat crop;

(6) That Amend did not permit Light to prepare for and plant the 1965–66 wheat crop relying upon an oral promise to work out mutually agreeable provisions of a lease;

(7) That Amend did not sustain damages for reason of his loss to use the 1964–65 wheat pasture;

(8) That there was no market value of the use of the farming and grazing

purposes by A. C. Light during 1965–66 and the 1966–67 crop year;

(9) That Light was not negligent in the maintenance of pumps and gearheads owned by Amend;

(10) That Amend had not received ⅓ of the market value of all crops produced on said land either in cash or in kind (except the 1967 wheat crop);

(11) That the $10,000.00 paid by Light to Amend on May 18, 1964, had not been deducted from the settlement of the crops harvested under the terms of the written lease in question;

(12) That Amend by words, acts and conduct waived his election to terminate the written lease;

(13) That the lease agreement was not changed by mutual agreement on or about the end of the wheat harvest in 1965 whereby Amend was to receive ⅓ of all cash crops delivered to him in the nearest elevator, or in case of hay crops, at a point designated on Section 75;

(14) That at the time the written lease was executed Light and Amend had a contemporaneous agreement that Light would have the use of the grass pasture on Section 75 rent free;

(15) That Amend had accepted rents which accrued after May 14, 1965, under the terms of the written lease;

(16) That during the 1965–66 crop year after May 14, 1965, Amend by his words, acts and conduct led Light to believe that Light had possession of the land under the written lease for a three-year term ending upon harvesting of the wheat crop in the year 1967 and that Light relied upon such words, actions and conduct of Amend and that Light acting upon such reliance expended substantial sums of money to convert the land in question from a dry land farm to an irrigated farm and in reliance upon such

acts, Light expended substantial sums of money for equipment to farm the land;

(17) That Light expended $8,594.21 in 1964 and $20,503.14 for the years 1965 through 1967 as reasonable and necessary expenses for fertilizer applied on the land;

(18) That it was necessary for Light to repair pumps at his own cost and that the sum of money which he reasonably expended was $1,820.22;

(19) That Amend by his words, acts and conduct prevented Light from selling the 1967 wheat crop and that Light owns ⅔ of the 1967 wheat crop in storage.

The judgment recited that the court finds from the evidence and the verdict of the jury that Light should recover of and from Amend, individually, and Amarillo National Bank of Amarillo, Texas, Trustee of the "James Edward Amend Trust" joint and severally the sum of $19,621.29. The judgment further recited that the court finds from the evidence and verdict of the jury that Amend, individually, and Amarillo National Bank of Amarillo, Texas, Trustee of the "James Edward Amend Trust" should recover of and from Light the sum of $4,990.64. The judgment set out the specific items of damage each party should recover. The court then entered judgment in favor of Light for the sum of $14,630.65 being the difference between the $4,990.64 and the $19,621.29. From that judgment the appellants perfected this appeal.

Hereinafter J. D. Amend and the Trustee will be referred to as appellants and Light as appellee. Light maintained possession of the land in question and farmed the same for the three years set out in the lease contract, and then delivered possession of the land to Amend. Therefore, the question of possession is not involved and the main consideration here involved concerns the interpreting of the lease agree-

ment and the damages claimed by the parties.

By appellants' first point of error it is contended the court erred in granting judgment for $7,060.35 based upon Amend's preventing the sale by Light of the 1967 wheat crop because there was no evidence, or alternatively insufficient evidence, to support such recovery. By appellants' second point of error it is contended the court erred in excluding testimony of Mr. Wann at the hearing of appellants' amended motion for a new trial. Said testimony of Wann was that after the trial Light sold enough of the wheat to pay the storage on the wheat. Since appellants present these two points together we will discuss both points in that same manner. In passing on the no evidence point, we consider only the evidence favorable to the findings and in passing on the insufficient evidence point, we consider the entire record. Trinity River Authority of Texas v. Mc-Murrey et al., Tex.Civ.App., 411 S.W.2d 422 (n. r. e.); Francis v. Francis, Tex.Civ. App., 407 S.W.2d 295 (reversed on other points).

The jury herein found that Amend by his words, acts and conduct prevented Light from selling the 1967 wheat crop then in storage. We must, therefore, consider only the evidence, which viewed in its most favorable light, tends to support this finding and disregard all evidence that would lead to a contrary conclusion. Neeley v. Southwestern Investment Co., 430 S.W.2d 465 (Sup.Ct.); Texas & New Orleans Railroad Co. v. Day, 159 Tex. 101, 316 S.W.2d 402; Lee v. Lee, 424 S.W. 2d 609 (Sup.Ct.).

The $7,060.35 here involved represents interest, storage charges and the difference of the cash market value of the 1967 wheat crop on August 1, 1967, and the cash market value of the 1967 wheat crop on the date of the trial, all of these items being based upon ⅔ of the wheat. The amount of the 1967 wheat placed in the Sunray Co-op Grain Elevator here in question was 26,501 bushels, being the last crop harvested involved herein. The lease agreement provided the $10,000.00 paid by A. C. Light on May 18, 1964, shall be deducted from the settlement of the last crop harvested under the terms of this agreement. Consequently, there was to be a settlement made at the end of the lease. It is undisputed that at the time the 26,501 bushels of wheat were placed in the elevator in 1967 that the cash market value of such wheat was $1.43 per bushel, and that the cash market value of the wheat at the time of the trial was $1.25 per bushel, and that the storage charges amounted to $.13 per bushel per year and being a fraction over $.01 per bushel per month.

Concerning the proof that Amend prevented the sale of the 1967 wheat crop so as to damage Light, Arthur Corse, manager of the elevator in which the wheat was stored, testified in part as follows:

"Q. All right. Mr. Corse, did you have occasion some time during the month of September, 1967, and after the 1967 wheat harvest, did you have occasion to talk with Mr. A. C. Light in the elevator there about what disposition would be made of the 1967 wheat crop?

A. Yes, sir, he was in my office several different times and we talked about the wheat crop.

Q. Did he indicate his desire to sell his part of the 1967 wheat crop?

A. Yes, sir, at one time I think he wanted to sell it, uh-huh (yes).

Q. Did he indicate during this September, 1967, period that he didn't want to sell it?

A. Well, I don't remember whether he indicated that he didn't want to sell

it or not, after the difficulty arose on the split of the wheat, why he didn't sell it.

Q. And did you tell Mr. Light there in your office that Mr. Amend would release his part of it if Mr. Light would release his part?

A. Yes, sir, I had word from Mr. Amend first here that he had an interest in all the wheat but he didn't say what part was his and so forth, then later on, and I didn't put down the date, but later on Mr. Amend said that he would be willing to release Mr. Light's—or any claim on Mr. Light if Mr. Light would release any claim on his part of the wheat, but I don't know exactly what date that first occurred."

*    *    *    *    *    *

"Q. Mr. Corse, what was the date of the letter that you got from Mr. Amend about claiming an interest in the wheat?

A. The letter was dated July 1, 1967.

Q. And what effect did that have with what you would do with the wheat when you got that letter?

A. Well, it made me hesitate to make any settlement on the wheat or make any disposition of it or allow anyone else to because I didn't know who it belonged to.

Q. All right, sir. In other words, with your customary procedure, you wouldn't allow Mr. Light to sell it or anybody else to sell it until that was worked out, is that correct?

A. Well, they could determine who it belonged to, yes, sir, that's correct."

*    *    *    *    *    *

"Q. Mr. Corse, after you got that letter Mr. Owen referred to from Mr. Amend concerning his claim of a part of the 1967 wheat crop, did you subsequently hear from Mr. Amend?

A. After I received the first original letter?

Q. Yes.

A. Yes, sir.

Q. And what was the communication from him in the subsequent communication?

A. Well, he was in the office later on and he wrote on the original letter right here and signed it that he would release—may I read what he said or do you want it read?

Q. Well, yes, sir, just tell the jury what he said.

A. He said, 'If A. L. Light is agreeable to releasing one-third of the wheat to my account, I will in turn release my claim against two-thirds and then let it apply to his account.'

Q. All right. Now when was that done?

A. Well, that's—I can't remember, some time after this original letter later on but I don't remember the date and we didn't put any date down on it here.

Q. Well, would it have been some time after wheat harvest of 1967?

A. Yes, sir.

Q. Would it have been before the first of October, 1967?

A. Yes, sir, because I have a letter here concerning it dated in September, you see.

Q. All right. Now, after you received that communication from Mr. Amend, would you have then, under your policy in the elevator, have paid out the 1967 wheat crop to Mr. Amend and Mr. Light?

A. If they could have agreed on it, yes, sir."

The fact that the elevator, because of Amend's claim to the wheat, would not permit either party to sell the wheat before the trial until Amend and Light reached an agreement, and then permitted Light after the trial to sell to the elevator enough of the wheat to pay the storage charges would have no bearing upon the action of Amend preventing the sale of the wheat prior to the trial, and the court did not err in refusing the testimony of one assistant manager of the elevator that the sale was made. Appellants' first and second points of error are overruled.

By appellants' third and fourth points of error it is contended the court erred in granting Light $10,626.67 as reimbursement for cash rent paid May 18, 1964, because there was no evidence or insufficient evidence to support such recovery, and in constructing the lease contract as meaning the annual cash payments to have been made by Light were 1/3 of all crops produced from the land or $38,000.00, which-

ever was less, there being no evidence or insufficient evidence to support such construction. The trial court construed the lease contract as providing that Light was to pay 1/3 of all crops produced or $38,000.-00 whichever was less. The $10,000.00 was paid on May 18, 1964, and the jury found that sum had never been deducted or paid to appellee. The lease provides the $10,-000.00 shall be deducted from settlement of the last crop harvested under the terms of the agreement. Although the parties herein do not agree as to the meaning of the lease agreement the undisputed evidence shows that they continued to carry out the lease upon the basis of 1/3 of the crops as rental.

It is settled law that the construction of a written instrument is a question of law and is one for the court. On the other hand if the written instrument is ambiguous and it becomes necessary to resort to extrinsic evidence to ascertain the intention of the parties, the issue then becomes one of fact to be determined by the jury. However, in those cases of ambiguous instruments when extrinsic parol evidence that is introduced is undisputed as to the circumstances, the construction is then again a question of law for the court. Turner v. Montgomery, 293 S.W. 815 (Tex. Com.); Neff et al. v. Ulmer, Tex.Civ.App., 404 S.W.2d 644 (n. r. e.); Schindler v. Thomas, Tex.Civ.App., 434 S.W.2d 187. Appellants' third and fourth points are overruled.

By appellants' points five and six it is contended the court materially erred in constructing the lease so as to deny, and in denying Amend judgment for damages for loss of the use of 1/2 of the wheat pasture grazing during the 1965–66 wheat pasture season as there was no evidence, or alternatively insufficient evidence, to support such construction and denial, and

the same contention is made as to the free use of Section 75 grass. Appellants claimed they were entitled to damages because of their loss in being deprived of their right to pasture their cattle upon the voluntary wheat crop for 1965–66. Amend testified he told Light he had some cattle to put on the voluntary wheat but never made any further demand of him. There is no evidence that Light ever refused to permit Amend to place his cattle on the wheat. Appellants state that Light stocked this pasture only to about 25% of its carrying capacity and was unable to offer any excuse as to why he did not offer ½ of the use of the pasture to Amend. There is no evidence to indicate that Light ever refused to permit Amend to place his cattle on his pasturage. The jury found that appellants were not damaged in their loss of the use of ½ of the wheat pasture. The lease agreement provides:

"The lease on Section 75 is contingent on A. C. Light buying at least one-half (½) interest in the 120 head of yearlings being placed on said Section 75."

The lease does not in any manner mention or suggest what that contingency was, but Light testified that he and Amend had a contemporaneous oral agreement that if Light would buy ½ interest in the 120 head of yearlings placed upon Section 75 he was to have free use of ½ of the grass pasturage on Section 75, and if he purchased the entire 120 head he was to have free use of all the grass pasturage. Then he testified that he purchased the 120 head and was to have the free use of all the grass. We hold it was proper to permit evidence to show what the contingency mentioned in the lease was.

Although appellants' assignments of error five and six only contend there was no evidence and insufficient evidence to support such conclusion, they argued that the court erred in permitting the defendant to file a trial amendment alleging a contemporaneous oral agreement. We hold there was no abuse of discretion of the trial court. It is stated in Western Alliance Insurance Co. v. Childs, dba Childs Insurance Agency, Tex.Civ.App., 359 S.W. 2d 310 as follows:

"Defendant did not make a motion for continuance or delay based on the Trial Amendment, or assert that it was in any manner surprised or prejudiced thereby. The matter of permitting a trial amendment is in the sound discretion of the Trial Court, and his order will not be disturbed, absent a clear abuse of discretion. Vermillion v. Haynes, 147 Tex. 359, 215 S.W.2d 605; Rule 66, Texas RCP. A trial court does not abuse its discretion in permitting the filing of a trial amendment where the opposite party does not ask for a postponement upon its filing. Henslee v. 1st Nat. Bank, Tex.Civ.App. (n. r. e.) 314 S.W.2d 881; Lone Star Steel Co. v. Owens, Tex.Civ.App. (n. r. e.) 302 S.W. 213; American Cas. & Life Ins. Co. v. Parish, Tex.Civ.App. (n. w. h.), 355 S.W.2d 781."

We overrule appellants' points five and six.

We hold this record clearly shows that the parties herein continued the lease for the three years upon the basis of a ⅓ of the crops as rent to the landlord, and by their acts, confirmed that understanding and agreement. It is stated in Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566 at 570 as follows:

"If there is any doubt about the meaning of the various terms of the contracts

before us, the Court may consider the interpretation placed upon them by the parties themselves. In this instance the acts of the parties indicated the construction mutually placed upon the contracts at the time, including the acts done in their performance, and same are entitled to great if not controlling weight. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of the intention of the parties that whatever was done by them in the performance of the contract was done under the terms of the contract as they understood them, and as under the terms of the contract it was intended should be done. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504; Galveston, H. & S.A.R. Co. v. Johnson, 74 Tex. 256, 11 S.W. 1113; E. H. Perry & Co. v. Langbehn, 113 Tex. 72, 252 S.W. 472; San Antonio St. Ry. Co. v. Adams, 87 Tex. 125, 26 S.W. 1040; Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 85 A.L.R. 391; Neblett v. Armstrong, Tex.Com. App., 26 S.W.2d 166, 75 A.L.R. 577; Cooley v. Buie, Tex.Com.App., 291 S.W. 876; 10 Tex.Jur., p. 298, § 171; 17 C.J.S. Contracts § 325, page 755; 12 Amer.Jur., p. 787, § 249.

"Since forfeitures are not favored, courts are inclined to construe the provisions in a contract as covenants rather than as conditions. If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed. Knight et al. v. Chicago Corp. et al., 144 Tex. 98, 188 S.W.2d 564; Decker v. Kirlicks, 110 Tex. 90, 216 S.W. 385; Bouldin v. Gulf Production Co., Tex.Civ.App., 5 S.W.2d 1019, writ dismissed; 12 Tex. Jur., p. 129, § 85. This is particularly true where the parties themselves have

construed such a contract. Lone Star Gas Co. v. X-Ray Gas Co., supra; 19 Tex.Jur., p. 803, § 7.

"Unless the consideration in a contract is expressed in terms which unmistakably will demand a forfeiture for nonperformance, a mere breach of such terms will not authorize the cancellation of the contract. Tripplehorn v. Ladd-Hannon Oil Corp., Tex.Civ.App., 8 S.W. 2d 217, writ dismissed 118 Tex. 195, 13 S.W.2d 666; Chicago, T. & M.R. Co. v. Titterington, 84 Tex. 218, 19 S.W. 472, 31 Am.St.Rep. 39."

See also G. C. Murphy Co. v. Lack, Tex. Civ.App., 404 S.W.2d 853 (n. r. e.) and the many authorities there cited.

We have carefully considered all of appellants' assignments of error and overrule all of them. The judgment of the trial court is affirmed.