**SLAY et al. v. MARY COUTS BURNETT TRUST.**

No. 2420.

Court of Civil Appeals of Texas. Eastland.

April 7, 1944.

Rehearing Denied May 12, 1944.

Martin, Moore & Brewster and Otis Rogers, all of Fort Worth, for appellants.

B. V. Thompson, of Fort Worth, for appellee.

GRISSOM, Justice.

Plaintiffs, Dr. Charles H. Harris, E. E. Bewley, Charles F. Roeser, Mark McMahon, and W. K. Stripling, as trustees of the Mary Couts Burnett Trust, brought this suit for the use and benefit of said Trust and its beneficiary, Texas Christian University. The defendants are W. H. Slay, U. M. Simon, W. C. Proctor, Ray E. Longmire and Martha Roberta Sweatt, sole beneficiary and independent executrix of the will of John H. Sweatt, deceased, who died in July, 1941, while his depositions were being taken in this case. The original petition was filed on March 7, 1941. Plaintiffs sought recovery on nine separate and distinct transactions occurring over a period of three years, from 1936 to 1939, any one of which would constitute the basis for a law suit. These transactions may in the main be generally classified as those wherein plaintiffs sought recovery of alleged secret profits received by Slay, Simon and Sweatt, while Slay and Sweatt were trustees and Slay and Simon were attorneys for the Trust, which secret profits were alleged to have been divided with the other defendants; and those in which plaintiffs sought to recover damages for alleged losses on loans, occasioned by breaches of trust on the part of Slay, Simon and Sweatt as trustees and attorneys and in which the other defendants are alleged to have knowingly participated.

No answer was filed for the Sweatt Estate. Judgment was rendered against it by default and no appeal was taken therefrom. The other defendants answered, and, among other things, denied that they were guilty of breaches of trust. They alleged that the monies received by Slay, Simon and Sweatt were legitimate extra compensation for special services rendered and that the other defendants had a legitimate right to the monies received by them. That the loans were made in good faith; that if losses resulted, they were caused by errors of judgment, not by breaches of trust committed by said trustees and attorneys; that the fees were contracted for and fixed after applications for loans had been voted upon by the trustees and at a time when the fees could not have affected the vote of the trustees; that recovery on all transactions, except the Tex-Oil Producers loan, was barred by the statutes of limitation; that while some of the loans were in default, the Trust had taken over the security and that the Trust had suffered no loss.

The case went to trial before the court and a jury. After a trial lasting about six weeks the court submitted the case to the jury upon 105 special issues. The jury failed to answer any of the issues and was discharged. Thereafter, the court entered judgment on its own motion. Defendants have appealed.

Judgment was rendered for Slay and Simon on the O'Neill and Proctor-Ward County transactions and against the plaintiffs and for the Estate of Sweatt and for Slay and Simon for the interest paid by the Trust on the money it borrowed, while Sweatt and Slay were trustees, for the purpose of making the Lynch, Proctor-Ward County, Public Service Corporation and Tex-Oil Producers, Inc., loans. Plaintiffs do not complain of said portions of the judgment, and in said respects it is affirmed.

Defendants' first two points are that the court erred in rendering any judgment against Slay, Simon, Proctor and Longmire (1) when a jury had been demanded and had been excused for failure to agree upon any issue submitted, and (2) without notice of a hearing on plaintiffs' motion for judgment. Plaintiffs had seasonably filed a motion for an instructed verdict. It was taken under advisement, and the case submitted to the jury. After discharge of the jury plaintiffs filed a motion for judgment which was likewise taken under advisement. Thereafter, as shown by the judgment, the court concluded that plaintiff's motion for a pre-emptory instruction should have been granted in substance, and that plaintiffs were, as a matter of law, entitled to a judgment. Whereupon, the court, without notice to defendants, proceeded to render the judgment that it considered was required by the undisputed evidence.

It is evident that plaintiffs' suit asserts many divisible causes of action; that in some instances, even as to the same general transaction, there are independent grounds of both recovery and defense relating to different, separate and distinct

items. We are of the opinion that reversible error was not committed by the action of the Court in discharging the jury and thereafter rendering judgment on his own motion as to some of the transactions and on some grounds of recovery, because, we think, as to them there were no issues of fact to be determined and the judgment rendered was the only judgment that could, in any event, properly be rendered. As to others, we think issues of fact were raised by the evidence. R.C.P.Tex. 434; Handy v. Olney & Ref. Co., Tex.Civ.App., 68 S.W.2d 313, writ refused; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509; Clark v. Jones, Tex.Civ.App., 164 S.W.2d 62, 63; Zachary v. City of Uvalde, Tex.Com.App., 42 S.W.2d 417; Adams v. Houston Nat. Bank, Tex.Com.App., 1 S.W.2d 878, 880 and 881; Henenberg v. Winn, Tex.Civ. App., 1 S.W.2d 432, 434. See also Lawrence v. Cananea Consol. Copper Co., Tex. Civ.App., 237 S.W. 959, 962, writ dismissed; First Nat. Bank v. Corbin, Tex.Civ.App., 153 S.W.2d 979, 981; 25 Tex.Jur. 433; and, American Nat. Bank v. Sheppard, Tex. Civ.App., 175 S.W.2d 626, 628. These decisions will be hereafter made clear in our separate discussion of each of the transactions on which judgment was rendered against defendants.

In 1923 Mrs. Mary Couts Burnett executed a Trust Indenture wherein she conveyed property of the alleged value of $3,000,000 to herself, Dr. Chas. H. Harris, Mrs. Ollie Lake Burnett, Mrs. Ella Bardin, W. H. Slay and John H. Sweatt, as trustees, for the use and benefit of Texas Christian University. In their written acceptance of the trust said trustees agreed to execute the trust with fidelity and account for all monies received by them. Mrs. Ollie Lake Burnett and Mr. Sweatt were related by marriage to Mrs. Mary Couts Burnett. At the time of the execution of the trust indenture Mr. Slay and his law partner, Mr. U. M. Simon, were Mrs. Mary Couts Burnett's attorneys. Thereafter, until August, 1940, Slay and Simon were attorneys for the Trust and Mr. Slay, after Mrs. Mary Couts Burnett's death, was Chairman of its Board of Trustees. Prior to the execution of the trust indenture Mrs. Bardin had at one time been employed by Slay and Simon, and, when the trust agreement was executed, she was the private secretary of Mrs. Mary Couts Burnett, to which position she had been recommended by Mr. Slay. Mrs. Mary Couts Burnett died December 18, 1924. In accord with the provisions of the trust indenture, no trustee was elected to succeed her. Mrs. Ella Bardin died in 1931, and although the trust indenture provided for the election of her successor by the remaining trustees, no successor trustee was elected until 1940, after trustees Slay and Sweatt resigned.

The trust indenture provided that compensation of the trustees was to be fixed by the Board of Trustees. After Mrs. Burnett's death the trustees were paid monthly salaries which were changed occasionally, but, during most of the time, the trustees received monthly salaries of $200 each for administering the trust, except Slay who was paid $400 per month. Slay's salary went into the firm of Slay and Simon and was considered as also compensation for incidental legal services.

In March, 1936, the Burnett Trust began making "oil loans," and thereafter for several years made loans to persons engaged in the oil business. The Trustees did not demand nor receive financial statements from such borrowers. They made loans to persons of slight or no financial responsibility, loaning in many instances all and in others more than the purchase price of the property bought by the borrower with funds furnished by the Trust. In some instances, notably the "Big Indian" loan, the property purchased with only a part of the money borrowed from the Trust constituted the sole security for the loan. In some loans, including Big Indian, the money was loaned for the purpose of buying mineral interests owned by concerns then in the hands of a receiver. In order to make some of such "oil loans" the trustees borrowed money.

## Big Indian Loan.

W. C. Proctor and Ray E. Longmire had known each other for several years prior to 1936, and were partners when the Big Indian loan was made. In 1935 Longmire introduced Proctor to Sweatt. Proctor met Slay and Simon in 1936, when he went to see Slay, as trustee of the Burnett Trust, for the purpose of obtaining a loan. Proctor and Sweatt had formed the idea of obtaining a loan for themselves, or for themselves and Longmire, for the purpose of purchasing "units", or what was in effect mineral deeds, issued by the Big Indian Syndicate, then in receivership, and attempting to obtain a majority of the units in said organization and finally securing a sale of those units at a profit, through a receiver or otherwise. Having been unsuccessful elsewhere, Sweatt

suggested to Proctor that he contact Slay and see if the Burnett Trust would make a loan. The indefinite minutes of the Burnett Trust prior to March 31, 1936, dictated and signed by Slay and usually also signed by Sweatt, show that in the proceedings leading up to the final delivery of the trust money to Proctor, that Slay and Sweatt took a leading part. The minutes show that Slay and Sweatt were designated by the Board of Trustees to work out the details of a proposed loan by the Trust to Proctor, Trustee, for the purpose of purchasing units in the Big Indian Syndicate. Prior to March 31, 1936, an attorney in the office of Slay and Simon, their associate or employee, started an examination of the title to some of the units in the Big Indian Syndicate that Proctor proposed to purchase for himself and others, with money to be loaned for that purpose by the Trust. The minutes of the Burnett Trust, dictated by Slay, do not show how much money the Trust agreed to loan to Proctor for such purpose, if any definite amount was ever agreed upon. Furthermore, the minutes do not show how much per unit the Burnett Trust agreed to loan to Proctor. In the minutes prior to March 31, 1936, there are some indefinite statements susceptible of the interpretation that the Burnett Trust at that time contemplated purchasing some of said units for itself, as will be hereinafter shown.

March 31, 1936, was an important date in handling the loan to Proctor, Trustee, for the purpose of purchasing units in the Big Indian Syndicate. Without any minutes of the Board of Trustees directly authorizing such action, on that day Slay signed a check drawn on the Burnett Trust for $77,128.10 payable to Proctor, Trustee, and Proctor immediately out of said check obtained in cash $10,657.53, and distributed among Slay and Simon, Sweatt, Longmire and himself. Slay and Simon received 50 per cent thereof, that is, $5,328.76 in currency. Sweatt received $2,560, Longmire $1,384.38, and Proctor retained $1,384.39. Although of those just named only Slay and Simon resided in Fort Worth, they were all present in that city at the time said check for $77,128.10 was delivered by Slay to Proctor.

The minutes of the Trust of February 19, 1936, show that Sweatt presented to the trustees the matter of making a loan "*as well as an investment*" in connection with the owners and prospective purchasers of stock in the Big Indian Syndicate. They further recite: "Mr. Sweatt advised that in connection with Mr. Slay, he had gone forward with negotiations, that abstracts had been submitted and examined and returned for certification to date, and that such other data and information that might be necessary to determine the character of title offered by the Applicants of the loan * * *." And further: "The Trustees evidenced their willingness to go forward and directed Mr. Sweatt to continue his negotiations, looking to the end that good and sufficient title be offered before any money should be advanced as a loan, *or otherwise.*" (Italics ours.)

When Mr. Slay's deposition was taken he was questioned as to the final agreement made by the Trust with Proctor. He testified that Proctor said he might want to borrow as much as $200,000. That the Board agreed to make this "oil loan" (1) if the appraiser's report was good, and (2) if the title was good. Mr. Slay, at that time, also testified repeatedly that Proctor said he wanted to borrow "not in excess of $300 a unit," and that the Trust agreed to lend, if the appraiser's report was good and if title was approved (meaning, of course, if the title was approved by Slay and Simon) "not to exceed $300 a unit." It is true that he later took the position that the Trust was to lend to Proctor a flat $300 per unit; that if Proctor bought for less than $300 the difference was Proctor's, to do with as he pleased. The minutes of April 10, 1936, dictated and signed by Slay, recite that Sweatt called attention to the fact that Proctor had mentioned to him the importance of checking up on the Big Indian property and the Great Plains loan at an early date, that the trustees directed Sweatt within the next ten days to make a check of the properties involved and obtain a written report from a responsible party of the condition of the properties, at a cost of not more than $50. They also recite that Slay called attention to the fact that owing to the advancements made on the Big Indian Syndicate and the necessity for further advancements on that loan upon the tender and approval of certificates, it would become necessary for the Trust to borrow money. Said minutes further recite, with reference to the Big Indian loan, that the trustees discussed the matter in detail and "discussed the fact that Mr. Sweatt, Mr. Slay and Dr. Harris had considered the matter together in private

conference and that Mrs. Burnett had been advised in detail as to the nature of same, and then pursuant to the understanding had by Mr. Sweatt, Mr. Slay and Dr. Harris in private conference, the loan had been carried forward and that the title had been approved by the Trust's attorneys and that $77,128.10 had been paid to W. Carl Proctor, Trustee, as first advancement upon this loan; for which a note for said amount secured by deed of trust on the leasehold interest involved was delivered to the Secretary of the Trust, * * * *These funds were used by the said Proctor for the purpose of purchasing certificates from the Trans-State Oil Company, and others,* title to which had been approved at the time said advance was made. Mr. Slay then called attention to the fact that it would be necessary that payment be made for certificates in said company as they were presented, and title to same were approved.

"Whereupon, the Trustees directed and authorized Mr. Slay and the Secretary to draw checks and make payments for certificates when title to same had been approved by the Trust's legal department." (Italics ours.) Slay and Simon constituted the "Trust's legal department."

It is undisputed that out of the first advance to Proctor, Trustee, Slay and Simon received in cash $5,328.76, 50 per cent of the "surplus" not used to purchase units. It is also undisputed that the recital in the minutes of April 10th, referring to the advance made by Slay's check on the Trust to Proctor on March 31st, to wit: "These funds were used by the said Proctor for the purpose of purchasing certificates from the Trans-State Oil Company and others * * *," was false. In other words, it was undisputed that, contrary to the recitals in said minutes, $10,675.53 of said funds was immediately divided among the defendants. Other advances on said loan, hereinafter to be mentioned, were likewise immediately divided among defendants. The divisions among said group were approximately in the proportion as follows: 50 per cent to Slay and Simon (Slay being chairman of the Board of Trustees of the Burnett Trust and Slay and Simon being the attorneys for said Trust), and 25 per cent to Sweatt, (trustee of the Burnett Trust,) and the remaining 25 per cent was split by Proctor equally with his *acknowledged* partner, Longmire.

Thereafter, in connection with the loan made by the Burnett Trust to Proctor, Trustee, on the sole security of units in Big Indian purchased by Proctor with only part of the funds furnished by the Burnett Trust, checks were issued on the Trust signed by Slay and payable to Proctor, Trustee, as hereinafter shown. On July 13, 1936, $4,000. None of this check was used for the purchase of units. The entire amount was promptly divided among Slay and Simon, Sweatt, Proctor and Longmire in the proportions above indicated. In the distribution of these so-called "surplus" funds Sweatt usually obtained his share by drafts drawn on Proctor. On this occasion, in an evident effort to conceal the true situation, Proctor delivered to Slay and Simon, in money, promptly after the check was cashed, not merely Slay and Simon's 50 per cent, but 75 per cent, or $3,000. This transaction was attempted to be concealed on the books of Slay and Simon by showing $1,000 was received in trust for W. R. Adams and paid out to W. R. Adams. Adams was merely the alias for Trustee Sweatt. The $2,000 retained by Slay and Simon was entered on their books as follows: "Cash fee, Big Indian." The $5,328.72 cash paid to Slay and Simon on March 31, 1936, by Proctor, was entered on their books as a fee paid by Trans-State Oil Company. This recital on the books of Slay and Simon was false. They received no fee from Trans-State Oil Company. It was paid by Proctor out of funds immediately prior thereto obtained through Slay from the Burnett Trust.

On December 8, 1936, a check for $3,000 was in like manner issued and delivered to Proctor, Trustee, cashed by Proctor and promptly divided among defendants in approximately the proportions heretofore mentioned. On April 3, 1937, a check for $4,000 was issued on the Trust, signed by Slay and payable to Proctor, Trustee. This check was promptly cashed and divided among said parties in the same proportions.

On May 27, 1937, Slay wrote another check on the Burnett Trust and delivered it to Proctor. It was for $8,500. Slay admits that he knew Proctor was not going to buy units in the Big Indian Syndicate with said funds. Merely because Proctor asked for it over the telephone, it was delivered, and, according to Proctor, it was understood that Slay and Simon were not to participate in the split of this fund at that time, but that it would thereafter be accounted for when Sweatt, then receiver for Big Indian, made a distribution of funds in

the hands of the receiver from the sale of units. As a matter of fact, the $8,500 was borrowed for the purpose of turning it over to Trustee Sweatt for his own use. This was promptly done. It is undisputed that Slay and Simon got 50 per cent of said $8,500 on June 12, 1937.

Slay and Simon, attorneys for the Burnett Trust, say they were representing Proctor and protecting his interest in the Big Indian Syndicate by appearing as his counsel in a District Court of Dallas County, wherein the Big Indian Receivership was pending. There is evidence that at this stage of the proceeding, the Receiver resigned, and Slay urged the judge of said court to appoint Sweatt (Trustee of the Burnett Trust and owner of a one-fourth interest in the profits to be made by Proctor, Trustee, in his purchase of Big Indian units with funds supplied by the Burnett Trust), and represented to the judge that Sweatt was not interested in the Big Indian Syndicate. However, this is disputed. But, Slay does admit that he suggested the appointment of Sweatt as receiver, that he told the judge "Sweatt was a capable man, a competent man, an honorable, and that stuff," but he denies telling the judge that Sweatt was not interested in the Big Indian Syndicate. He explained that he just didn't think of the fact that Sweatt was interested. Sweatt was appointed.

Thereafter, Receiver Sweatt made the first distribution of the assets of that receivership. He paid to Proctor, Trustee, in the first distribution, $35,500. Proctor added to said sum the $8,500 theretofore obtained by him from the Burnett Trust through Slay and loaned to Sweatt. Taking said $8,500 loan into consideration, he then had on hand for defendants $44,000. Charging the $8,500 to Sweatt's interest in said split, division, dividend, "anticipated profit", or whatever it may properly be called, he then proceeded to partition said $44,000 as follows: $22,000 to Slay and Simon, $2,500.75 to Sweatt, $5500 to Longmire, leaving net to Proctor, Trustee, $5,-499.25. In other words, Slay and Simon got 50 per cent, Sweatt 25. per cent, and Proctor and Longmire 25 per cent. Thereafter, from the sale of units by the Receiver, he paid another dividend to Proctor, Trustee, of $15,254.21. Out of this second distribution by the receiver there was promptly paid to Slay and Simon, in currency, exactly 50 per cent of this dis-tribution, to wit, $7,627.10. Sweatt received his 25 per cent, and Longmire and Proctor their 25 per cent. Slay and Simon's books did not show the source of this fee. In the space in which the name of the client paying the fee, or the name of the case, was usually written was merely the following: "June Dep." The only check shown to have been accepted by Slay and Simon in connection with their dealings in the Big Indian Syndicate was the check for $22,000 issued by Proctor following the first distribution by Receiver Sweatt. The receipt of this sum was camouflaged on the books of Slay and Simon by showing receipt of a cash law "fee in Big Indian" of $11,000 and a *"loan"* of $11,000 to Slay and Simon by Proctor. Slay and Simon admit that no such loan was ever made.

It is the position of the Plaintiffs, adopted by the eminent trial judge, in connection with the Big Indian loan, that the borrower Proctor, Trustee, obtained all of said money from the Burnett Trust for himself and as trustee for the other defendants; that Slay and Sweatt, as trustees of the Burnett Trust, and Slay and Simon, as attorneys for the Burnett Trust, breached their respective trusts as follows:

(a) In permitting Proctor to act as trustee for himself and Longmire in obtaining the loan for the purpose of purchasing Big Indian units; that said breaches of trust were known to Proctor and Longmire, who participated therein; that the breaches of trust by Slay and Sweatt were known to Simon, who participated therein; that $4,-079 is the principal balance due the trust on the Big Indian Loan by Proctor, Trustee, acting for all defendants. The trial court so found and rendered judgment against all defendants for the unpaid balance of the loan to Proctor, Trustee.

(We are convinced that the undisputed evidence requires this judgment as to Proctor and Longmire. Sweatt's executrix did not appear in the trial court nor appeal; therefore, we do not inquire as to whether such evidence requires a like judgment against Sweatt's estate. As to this portion of the judgment, so far as Slay and Simon are concerned, we think their evidence raises issues of fact.)

(b) That Sweatt and Slay and Simon committed breaches of trust (1) by entering into an agreement about March 31, 1936, with Proctor, Trustee (the said Proctor acting for himself and Longmire), that Slay and Simon should share 50 per cent,

488

Sweatt 25 per cent, and Proctor 25 per cent (for himself and Longmire), in the net profits realized by Proctor, Trustee, in the purchase of Big Indian units with money advanced by the Burnett Trust. (2) That Slay and Simon and Sweatt committed breaches of trust in sharing the fruits and profits of said venture; that Proctor had notice of such breaches of trust and participated therein; that Simon had notice of the breaches of trust by Sweatt and Slay and participated therein; that the total amount of profits shared by defendants in the Big Indian transaction was $80,911.74. The court so found from the undisputed evidence and rendered judgment accordingly.

■ (We believe the undisputed evidence required the findings and judgment mentioned in paragraph (b), except as against Slay and Simon relative to the $5,000 received by them from Proctor March 31, 1936. Slay and Simon testified, that this $5,000 was the fee theretofore agreed to be paid by Proctor for examination of title to the security that the other trustees and the beneficiary knew and acquiesced in the collection of fees from borrowers for the examination of the title to the security for loans. As to this item, it is believed issues of fact were raised by the testimony. See 41 Tex.Jur. 940.)

Getting back to March 31, 1936, the day Slay wrote a check on the Burnett Trust to Proctor, Trustee, for $77,128.10 and the defendants divided among themselves $10,-657.53 of the proceeds of said check, Slay and Simon on that day entered into three different contracts with Proctor, Trustee, fixing the amount of their "attorney's fee" for representing Proctor, Trustee. The parties for whom Proctor acted as trustee, other than Longmire, are undisclosed in said contract and are still undisclosed in this record, unless plaintiff's contention that Proctor was trustee for all the defendants is correct. In connection with the question as to who Proctor was trustee for, that is, what does the undisputed evidence show as to who was meant by "Proctor, Trustee", the record shows in connection with the Big Indian loan that if he was a trustee for anyone other than the defendants, such unknown persons got none of the proceeds or profits from his venture and dealings with the Big Indian Syndicate. The defendants got it all. All of the proceeds and so-called profits, "anticipated" or otherwise, other than that paid to the Trust,

that came into the hands of Proctor, Trustee, was divided among the defendants in approximately the following proportions: Slay and Simon 50 per cent, Sweatt 25 per cent, Proctor and Longmire 25 per cent.

Slay and Simon explain receipt of $328.-76 on March 31, 1936, by saying that Proctor delivered that sum on the day of the first advance, the same day he purchased the first units in the Big Indian Syndicate, as one-half the "discount" made by Proctor in the purchase of the first units. Slay and Simon say that Proctor told them that by paying cash for some units he was able to get a one per cent discount, which he divided evenly between himself and Slay and Simon. This so-called "discount" paid to Slay and Simon, as a part of the $5,328.-76 delivered to them by Proctor on March 31, 1936, must, we believe, be placed in the same class with other funds acquired by defendants by simply taking all, or a part, of the proceeds of a check drawn by Slay on the Burnett Trust to Proctor, trustee, and dividing it among defendants. With reference to the splitting of the proceeds of the other checks mentioned between defendants, Slay and Simon simply explain that they received 50 per cent of each of said checks, as "anticipated profits" in their venture with the borrower, Slay and Simon say their real contract with Proctor was for half of Proctor's profits in the Big Indian matter, as a contingent attorney's fee. Likewise, they explain their receipt of 50 per cent of the distributions made by Receiver Sweatt by saying it was their part of the "profits" in said venture with the borrower.

The $5,328.76 received in cash on March 31, 1936, from Proctor, admitted by Slay and Simon, is exactly 50 per cent of the amount of the "surplus" in the check for $77,128.10 drawn by Slay on the Burnett Trust and payable to Proctor, Trustee, on March 31, 1936. The undisputed evidence further shows that Slay and Simon received the same per cent from this division of Burnett Trust funds (advanced through Slay to Proctor and not used for the purpose of purchasing units or paying expenses), as they did from all other advances heretofore mentioned in connection with the Big Indian loan. According to Slay and Simon, $5,000 of the $5,328.76 delivered to them by Proctor on March 31, 1936, was in payment for the examination of the title to the units purchased and to be purchased by Proctor. According to Slay and Simon, the contract for $5,000 as

their fee for examination of the title to the security was distinct and separate from all other contracts for fees, made at a different time and not contingent upon the loan. It is apparent that at the time of said payment, said attorneys had examined the title to only about one-half of the units eventually purchased by Proctor. It is Slay and Simon's further position that this $5,000 fee was to be paid by the borrower, of which fact the trustees and beneficiaries had knowledge and to which they consented. It is evident that the $5,000 was not paid by the borrower but by the trust, unless it be true, as testified on the trial by Slay, that the Trust was to loan to Proctor a flat $300 per unit, regardless of the cost of the unit to Proctor, and that the difference between such cost and $300 belonged to Proctor so that he might do with it as he pleased. With reference to all these matters, concerning the $5,000 paid to Slay and Simon by Proctor on March 31, 1936, for examination of title to the security, we are of the opinion that the evidence raised questions of fact.

On March 31, 1936, Slay and Simon entered into a written contract with Proctor, Trustee, and Tabor and Dixon. This contract recited in substance that Proctor, Trustee, had contracted to purchase units in the Big Indian Syndicate, as set forth in a contract between Proctor and Trans-State Oil Company, and had also contracted to purchase units from Alcalde Petroleum Corporation and contemplated purchasing units from others. It recited that Proctor, Trustee, and Tabor and Dixon, had employed Slay and Simon to represent them "in connection with the matters involved in the purchase of said interests and the litigation concerning same;" that Proctor, Trustee, had borrowed money for the purpose of purchasing such interest "and contemplates borrowing other sums of money for the purchase of same;" and that it was contemplated that profits would be made. It was agreed (1) with reference to the purchase by Proctor, Trustee, from Alcalde Petroleum Corporation, that Tabor and Dixon (being representatives of Alcalde) should not participate in any profits derived from certificates purchased from Alcalde, but that such certificates and profits therefrom should be the sole property of Proctor, Trustee; (2) that said parties should pay to Slay and Simon as attorney's fees 25 per cent of the net profits that might accrue in any manner from said transaction. That for said consideration Slay and Simon agreed to perform "all legal services hereafter required, of every kind and character in connection with said transaction, whether the same be in connection with the purchase of interests, in the litigation pending over said Big Indian interests and properties, or in any other manner, to the end that neither * * * (Proctor, Trustee, nor Tabor and Dixon) shall be required to pay any attorneys' fees whatsoever for services hereafter performed, except the said contingent interest of twenty-five per cent." (3) *That all sums of money borrowed by Proctor, together with interest thereon, should be repaid "before any division * * *" of profits.* (4) That the net profits, other than those derived from certificates purchased from Alcalde, should be divided equally between Proctor, Trustee, and Tabor and Dixon. (7) The contract was expressly conditioned upon the purchase by Proctor, Trustee, of the Big Indian units owned by Alcalde and it was expressly stipulated that if said purchase was not made that said contract should become null and void. (It is apparent from the entire record that Tabor and Dixon, representatives of Alcalde, did not sell its units to Proctor, Trustee, and that said contract terminated.) Thereafter, on the same day, March 31, 1936, according to the testimony of defendants, Proctor predicated (which prediction came true) that Tabor and Dixon would not be able to carry out their contract, and Proctor told Slay and Simon he wanted a contract with them to cover everything in the way of attorney's fees in connection with the purchase of units by Proctor, Trustee, and the Big Indian Receivership case and including any defense against possible claims of Tabor and Dixon. Whereupon, said parties orally agreed that Slay and Simon should receive 50 per cent of all profits made by Proctor, Trustee, from his dealings in units in Big Indian Syndicate, purchased by funds loaned him by the Burnett Trust. Defendants admit that this contract was in effect at the time the funds were advanced to Proctor by the Burnett Trust and the divisions thereof were made by defendants.

After the 50 per cent contract was made between Proctor, Trustee, and Slay and Simon on March 31, 1936, Proctor and Sweatt left Slay and Simon's office, according to Proctor and Sweatt, and went out for a drink. They shortly returned to Slay and Simon's office. According to the testimony of a young lady who was then Slay and

Simon's stenographer, Slay then dictated a contract, giving Trustee Sweatt a 25 per cent interest in Proctor's Big Indian venture. From her testimony it would appear that when Simon discovered that such contract had been written he was unhappy; that Simon gathered up all the copies of that contract and destroyed them; whereupon, Simon proceeded to dictate the third contract entered into between Proctor and Slay and Simon on March 31, 1936. However, this testimony appears to be disputed by Slay and Simon and must be disregarded in deciding the issues relative to which her testimony is material. However, it is undisputed that after the 25 per cent and 50 per cent contracts had been made between Proctor and Slay and Simon on March 31, 1936, a third contract was entered into by said parties on the same day. It is in the form of a letter written at Fort Worth on March 31, 1936, addressed to Slay and Simon, and signed by Proctor, the body of which is as follows:

"With reference to the interests and properties known as the Big Indian Syndicate properties, and certain contracts dated March 31, 1936, involving the properties embraced in said Syndicates, this is to advise you that confirming our oral agreement, regardless and notwithstanding the proportions of profit or interests set forth in said contracts, or any of them, as between yourselves and myself, that all profits, emoluments, commissions, salaries, fees and advantages, whether in money or kind, and of whatever kind' or character growing out of said contracts or that may come to either of us, by virtue thereof, shall be divided between us as follows: "Three-fourths to you and one-fourth to me."

■ This letter was dictated by Simon. It is clear from the divisions shown how said parties interpreted said contracts. In other words, defendants' actions clearly disclose that by changing from the 50 per cent contract to this 75 per cent contract Trustee Sweatt's 25 per cent interest in Proctor's venture was being cared for without his name being mentioned in the written contract. In Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504, 508, Judge Sharp said:

"The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention that whatever was done by them in the performance of the contract was done under its terms as they understood and intended

same should be done. Galveston, H. & S. A. R. Co. v. Johnson, 74 Tex. 256, 11 S.W. 1113; E. H. Perry & Co. v. Langbehn, 113 Tex. 72, 252 S.W. 472; San Antonio St. R. Co. v. Adams, 87 Tex. 125, 26 S.W. 1040; Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 85 A.L.R. 391; Neblett v. Armstrong, Tex.Com.App., 26 S.W. 2d 166, 75 A.L.R. 577; Cooley v. Buie, Tex.Com.App., 291 S.W. 876, 10 Tex.Jur., p. 298, § 171; 17 C.J.S., Contracts, p. 755, § 325; 12 Amer.Jur., p. 787, § 249.''

Simon says he wrote it that way because Proctor told him to. Slay says he didn't know about the 75 per cent contract until July 6, 1936. Simon says he didn't ask who Proctor was trustee for. Slay says Simon and Proctor told him that, notwithstanding the 75 per cent contract, Slay and Simon were actually to receive only 50 per cent of Proctor's profits. Slay says he didn't ask his partner of thirty years who was to get the 25 per cent covered up in their 75 per cent contract and didn't learn this was Sweatt's interest until July, 1936.

■ In the deed of trust executed by Proctor, Trustee, on March 31, 1936, to secure the payment of a note for $77,122.56, as well as to secure the payment of subsequent loans or advances by the Trust to Proctor, Trustee, it was expressly provided that all proceeds from Proctor's investments in Big Indian Syndicate units should be paid directly to the Burnett Trust and not to Proctor. These instruments were written by Slay and Simon and their associate or employee was named trustee in said deed of trust. They were the attorneys for the Burnett Trust. It will be remembered that in the 25 per cent contract it was expressly stipulated that all money borrowed by Proctor, Trustee, and the interest thereon should be repaid before any division of profits between the parties thereto. The acts of the defendants in appropriating and dividing the money paid by Trustee Sweatt, the Big Indian Receiver, to Proctor, Trustee, without discharging the Trust's debt, was a conversion of said funds by said defendants and a breach of trust by said trustees and attorneys, who acted in violation of the contract written by Slay and Simon for the Burnett Trust.

Subsequent to the transactions heretofore mentioned, Dr. Harris was ill and asked the Secretary of the Trust to advise him immediately if anything unusual in the administration of the Trust came to her attention. The Collector of Internal Revenue sent

Proctor a notice that he had failed to file an employer's tax report. Proctor sent this notice to Slay and Simon, who wrote the Collector asking for the proper form for such a report. Slay and Simon wrote Proctor requesting a list of the names of employees, their social security numbers and salaries. Proctor then wrote Mrs. Caviness, Secretary of the Trust, that upon receipt of "her" letter regarding the social security report Proctor had written a friend in Dallas and requested him to secure from storage and send to Mrs. Caviness a portfolio in which she would find the wage slips covering the period inquired about. Proctor told Mrs. Caviness that if she would look in the portfolio she would find a folder marked "Pay-roll", etc. The package from the storage company was received by Mrs. Caviness about July 3, 1939. It contained the pay-roll and other data necessary for such report. Unfortunately for defendants it also contained Proctor's "partnership" income tax return. This return showed the partners to be Slay and Simon, John H. Sweatt, and W. C. Proctor. It showed the nature of the organization to be a joint venture. It also contained a copy of a workman's compensation insurance policy in which the premises of the employer were stated to be, among others, part of the Ward County lease purchased by Proctor with money loaned by the Trust. An endorsement was attached to the policy showing the name of the employer to be W. C. Proctor, J. H. Sweatt, W. H. Slay and U. M. Simon. It also showed the type of ownership to be a co-partnership. This information was conveyed to Dr. Harris, who was then in a hospital, by Mrs. Caviness, and Dr. Harris called Hon. Mark McMahon, an attorney, and asked him to bring suit to remove Slay and Sweatt as trustees. Said attorney gave the information to the beneficiary, who held a board meeting on July 31, 1940. Thereafter, on August 5, 1940, Slay and Sweatt tendered their resignations as trustees of the Burnett Trust. Their resignations were promptly accepted.

After the present Board of Trustees were elected, Slay and Simon requested permission to appear before the new board and explain the fees they had collected in connection with the Trust's loans. Slay and Simon and an associate appeared before the new board January 15, 1941. Simon testified that he told the new board that Slay and Simon had received $13,000 on the Great Plains loan, $5,000 of which they had placed in their trust account and $8,000 in their general account. Simon said he was asked if he did not feel that the trustees had the right to know the name of the party to whom this $5,000 had been paid. Simon admitted that in answer to such question he had told the new board: "It went to a man I do not even know." Simon further admitted that he told the new trustees that the man who got the $5,000 wasn't a Fort Worth party and was not connected in any way with the Burnett Trust. Said unknown party, "not connected with the Burnett Trust" was John Sweatt, Trustee of the Burnett Trust. Simon testified that he told the new trustees that his firm had entered into the 25 per cent and 50 per cent contracts in connection with the Big Indian loan, but that he did not exhibit the 75 per cent contract. He testified that at that time he had forgotten all about it; that he overlooked it; that it was then in Slay and Simon's safe sealed up in an envelope. Simon testified that one of their purposes in going before the new board was to tell the new board what Slay and Simon's fees were in connection with the loans made by the Trust. He testified, as to the Verser item of $2,000, that he then knew that Trustee Sweatt had received approximately one-third of that $2,000, but he did not think it was important to inform the new trustees of that fact and he didn't inform them. He testified that he did not tell the new trustees anything about the $25,000 that Slay, Simon and Sweatt divided in connection with the Public Service Corporation loan. Simon admitted that he knew that the new trustees, at that time, didn't know these facts about the Public Service Corporation loan. Simon told the new board that Slay and Simon had received $1,250 in connection with the Tex-Oil Producers loan. Simon testified that his "bookkeeper's" statement showed that Slay and Simon received from the Tex-Oil loan only $1250; that, as a matter of fact, Slay and Simon received in connection with said loan $6,500. That the statement taken by Slay and Simon to their meeting with the new Board of Trustees showed $1,250, instead of $6,500, collected by Slay and Simon in connection with the Tex-Oil loan.

It is the position of Slay and Simon, relative to the Big Indian transaction, that they were representing, as lawyers, Proctor, Trustee, borrower from the Burnett Trust; that they had a right to do so; that the sums heretofore mentioned were paid

them by Proctor as profits due them on their interest in Proctor's venture, under the terms of their 50 per cent contract of March 31, 1936. They say there was no conflict of interest; that after the Burnett Trust had agreed to make the loan to Proctor, Slay and Simon had a right to represent Proctor and do the things heretofore shown. Under their own testimony they were representing Proctor, Trustee, the borrower, at the time he actually received each of the advances made by the Trust. They still had titles to examine and approve for the Trust up until the last advance was made for the purpose of purchasing units in the Big Indian Syndicate and were at all times here material attorneys for the Trust. The minutes of the Trust and the undisputed evidence show that Slay and Sweatt were taking an active part, as trustees of the Burnett Trust, in working out the details of the loan to Proctor and each advance of money thereafter made to him. Although Slay and Simon say they represented Proctor in the Big Indian matter, it is difficult to determine from the entire record who and how many they did represent in the Big Indian transaction. At the time of each advance to Proctor, Trustee, Slay and Simon, as attorneys, and Sweatt and Slay, as trustees, were representing the Trust. At the time of each advance, according to their own testimony, Slay and Simon were also representing Proctor, Trustee. Slay knew when he wrote each of the checks heretofore mentioned that he and Simon were going to get a part of the proceeds of that check. Trustee Sweatt knew when the Trust made each of said advances that he was going to receive a part of such advance. None of them did anything to prevent the advance. On the contrary they were active in making it possible. Slay suggested to the judge handling the Big Indian Receivership case that he appoint Sweatt Receiver of the Big Indian Syndicate. Trustee Slay as a lawyer represented Trustee Sweatt as Receiver. Certainly after July 6, 1936, Slay and Simon knew when each check was issued that Trustee Sweatt was going to get part of the proceeds of the checks written by Slay. Slay continued to write checks on the Burnett Trust and take for Slay and Simon 50 per cent of the split between defendants. Slay and Simon admit they did not tell the other trustees, nor the beneficiary, that Trustee Sweatt was getting a part of the funds loaned to Proctor, nor that the Chairman of the Board of Trustees of the Burnett Trust, Slay, and the attorneys for the Burnett Trust, Slay and Simon, were sharing in said loan to Proctor, or that in some instances said chairman and attorneys were able to make 50 per cent of the amount of an advance on the loan by the simple expedient of having Slay write a check to Proctor and have Proctor cash it and divide the proceeds. As to knowledge of the other trustees and beneficiary, defendants' testimony goes no further than to raise an issue of fact that said parties had knowledge only that Slay and Simon and Sweatt intended to collect from the borrowers the customary fees for examination of titles and inspection of the security, and consented thereto. Slay and Simon persuaded the Court to allow them a fee of $3,000 out of receivership property, on Proctor's interest in which the Trust had a lien, for representing Trustee Sweatt as Receiver. At that instant they were representing Proctor, the borrower, Burnett Trust, the lender, and Sweatt, the interested receiver, who was paying out to Proctor, Trustee, funds that Slay and Simon were taking 50 per cent of, when the contract Slay and Simon had written for the Trust expressly required that such funds be paid directly to the Burnett Trust and not to Proctor. They were also necessarily representing those vague and elusive persons for whom Proctor was trustee. Certainly they were at the same time interested in their contingent interest of 50 per cent—and they knew the remaining defendants, Sweatt (Burnett Trustee and Receiver) and Proctor and Longmire would share in said distributions. Furthermore, they not only permitted said acts to be done but assisted therein in violation of the terms of the 25 per cent contract, as well as the deed of trust written by Slay and Simon for the protection of the Burnett Trust. Sweatt also obtained $3,000 for his services as a "disinterested" receiver. Apparently in an effort to keep as much of the money in the hands of the defendants as possible, Sweatt, Receiver, employed Longmire, Proctor's *acknowledged* partner in the Big Indian deal, to assist him in his labors as receiver.

In connection with the judgment for $4,079, unpaid principal due on the note signed by Proctor, Trustee, against all defendants, we call attention to the fact that Slay, Simon and Sweatt paid, out of the $3,000 allowed by the Court to Slay and Simon as attorneys for Receiver Sweatt, and the $3,000 allowed by the Court to

Sweatt as receiver, $4,500 to the Burnett Trust, to apply on the note of Proctor, Trustee. No explanation is to be found in the record why Slay, Simon and Sweatt paid this out of their own funds on the note of Proctor, Trustee, unless the real explanation is that Proctor was trustee for them. In connection with the two distributions of funds by the Receiver, which were divided 50 per cent to Slay and Simon, 25 per cent to Sweatt and 25 per cent to Proctor and Longmire, it must be remembered that each of such receipts and distributions were in direct conflict with the rights of the Burnett Trust under the terms of the deed of trust written by Slay and Simon, which instrument provided that said fund should not be paid by the Receiver to Proctor, Trustee, but should be paid directly to the Burnett Trust. As demonstrated by the manner in which Slay's check on the Burnett Trust for $8,500, dated May 27, 1937, was handled, all the defendants had to do to collect "anticipated profits" was for Slay to write a check to Proctor on the Trust, deliver the check to Proctor and for each of the defendants to then collect his share. This is the result of the defendants own interpretation of the contracts made by Slay and Simon with Proctor on March 31, 1936. See Lone Star Gas Co. v. X-Ray Gas Co., supra. Defendants probably thought they could collect such sums and the Trust would still be able to collect the principal and interest on their loan to Proctor, Trustee. Nevertheless, the necessary conflict of interest between the duties of Slay and Simon, as attorneys for the Trust, as attorneys for Proctor, Trustee, as attorneys for Sweatt, Receiver, and looking out for their 50 per cent interest in the venture of the borrower, Proctor, Trustee, is so conclusively shown that it does not justify detailed discussion. The same thing is true as to the duties of Slay and Sweatt as Trustees. Although defendants try to react a different conclusion, it cannot be disputed that each time Slay wrote a check on the Burnett Trust to Proctor, Trustee, and defendants divided the proceeds, and each time the Receiver paid out the proceeds of the sale of units in the Big Indian Syndicate to Proctor, trustee, and those funds were divided among defendants, without payment of the debt of Proctor, Trustee, to the Burnett Trust, the sole security of the Trust for the payment of its debt was diminished in proportion as the defendants were enriched. In connection with this conclusion, we call attention to the facts that Slay, Simon and Sweatt, attorneys and trustees of the Burnett Trust, who owe the duty of accounting to the Trust for the monies heretofore shown to have been received by them, testified that Slay and Simon at the time of the trial had no checks or deposit slips showing transactions occurring prior to 1939; that an associate or employee of Slay and Simon, shortly prior to the first advance, verbally told Slay, chairman of the Board of Trustees of the Burnett Trust, that title to the units in Big Indian Syndicate purchased by Proctor on March 31, 1936, was good, but, on the same day, Proctor agreed to pay Slay and Simon 50 per cent of his profits in the Big Indian venture to protect his interests. Slay and Simon's part of said profits for looking after the borrower's interests, according to defendants, amounted to nearly $40,000. On March 31, 1936, after Slay and Sweatt had been designated by the Burnett Trust as a committee to work out the details of the loan to Proctor, Proctor agreed to pay Trustee Sweatt 25 per cent of Proctor's profits in the Big Indian Syndicate. It is a strange loan where a borrower surrenders 87½ per cent of his anticipated profits before he is permitted to actually receive any of the money—specially when the lender's agents, trustees and attorneys, get 75 per cent thereof. Slay and Simon say that they were representing Proctor in the Big Indian Receivership suit, but they paid the expenses of that suit out of the funds of the Burnett Trust. It is further shown by the undisputed evidence that when it came time for the Receiver to make a sale of the Big Indian units Slay wrote a check *on the Burnett Trust* for $50,000 in favor of the Receiver, so that someone Slay and Simon were interested in might put up the check as a forfeit to prevent the sale by the Receiver at a less price than they thought the assets should bring. Slay testified, after he was shown the check and his memory was refreshed, that the reason he wrote the check was they got to thinking what fools they would be if they should sit back and let the Receiver sell the assets too cheap and thus "slough off that profit." Burnett Trust had no profits coming to it in any event. Under the agreements made by Slay and Simon and Sweatt, the Trust was not to get any profits. The defendants

were to get the profits. From the very language used by Slay, it is evident they were using the assets of the Burnett Trust to directly further the interest and advantage of the defendants. This should be sufficient to convince any unbiased mind of the necessary conflict of interest between the different parties represented by Slay, Simon and Sweatt as attorneys and trustees. The evidence shows conclusively that said fiduciaries did not deal openly and make full disclosure of their dealings with the trust funds but concealed them.

■ The principles of law that determine the disposition of this case are clearly shown in the authorities hereinafter cited and quoted from. "In dealing with the trust fund, the trustee's own personal interests and opportunities for gain must be cast completely aside. Absolute and scrupulous good faith is the very essence of the obligation. In administering the fund, he must act for the beneficiaries and not for himself in antagonism to their interests." 42 Tex.Jur. 710, 711.

■ "As to misapplication of funds, 'the rule of equity is that all the gain made by the trustee, by a wrongful appropriation of the trust fund, shall go to the cestui que trust, and all the losses borne by the trustee himself.'" 42 Tex.Jur. 723.

In the recent case of Kinzbach Tool Co., Inc., v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 513; our Supreme Court, in an opinion by Justice Critz, said:

"It is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship. * * * One occupying a fiduciary relationship to another must measure his conduct by high equitable standards, and not by the standards required in dealings between ordinary parties. * * *

"A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. *It is the law that* in such instances *if the fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.'* . (Italics ours.) * * *

"It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor with the fiduciary and is liable as such."

In United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 520, 54 L.Ed. 769, 19 Ann.Cas. 594, the Supreme Court of the United States said:

"It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, 'You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerout precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

In the early case of Merriman v. Russell, 39 Tex. 278, the Supreme Court of Texas said:

"The rule that a trustee shall not deal with the subject of the trust for his own benefit, is said to be absolute and universal. It is subject to no qualifications and to no exceptions.

"An abuse of a trust can confer no rights on the party abusing it, or those who claim in privity with him. It is a principle recognized at law in all cases, susceptible of being brought out as a ground of action or of defense in a suit at law, while its application in courts of equity is universally adopted."

See also Carey v. Safe Deposit & Trust Co. of Baltimore, 168 Md. 501, 178 A. 242, 247; Republic Nat. Bank & Trust Co. v.

Bruce, 130 Tex. 136, 105 S.W.2d 882, 883; Johnson v. Peckham, 132 Tex. 148, 152, 120 S.W.2d 786, 120 A.L.R. 720; Grebe v. First State Bank of Bishop, 136 Tex. 226, 150 S.W.2d 64; Hendricks v. Wall, Tex. Civ.App., 277 S.W. 207, writ refused; Ash v. A. B. Frank Co., Tex.Civ.App., 142 S.W. 42, 44; Driver v. Blakeley, 165 Or. 312, 107 P.2d 524, 527, 131 A.L.R. 985; Wendt v. Fischer, 243 N.Y. 439, 154 N.E. 303, 304; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, 125; William Cameron & Co. v. Blackwell, 53 Tex.Civ.App. 414, 115 S.W. 856, 858; Fleishhacker v. Blum, 9 Cir., 109 F.2d 543; National Cattle Loan Co. v. Ward, 113 Tex. 312, 255 S.W. 160; Vincent v. Werner, 140 Kan. 599, 38 P.2d 687, 692; Magruder v. Drury, 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151; Parks v. Schoellkopf Co., Tex.Civ.App., 230 S.W. 704; Bruun v. Hanson, 9 Cir., 103 F.2d 685, 699; United States Nat. Bank & Trust Co. v. Sullivan, 7 Wis., 69 F.2d 412, 415; 10 Tex.Law Review, 394; 65 C.J. 652, 653, 655, 656, 671; 26 R.C.L. 1388; 131 A.L.R. 990.

Defendants contend (1) that the present trustees of the Burnett Trust are without authority to maintain this suit without joinder of the beneficiary, and (2) that the suit is barred by the statutes of limitation. These contentions are overruled.

By the provisions of the trust indenture the trust property was conveyed to the trustees named therein and their successors until twenty years after the death of the last surviving trustee named in said instrument. It is manifest that several of the trustees named in the trust indenture still survive. Thus, termination of the Trust, twenty years following the death of the last named trustee, is shown to be an indefinite date far in the future. The property was conveyed to the trustees named and their successors with direction that they take possession thereof with authority to grant, bargain, sell, etc. all or any part of said estate, or any reinvestment or substitution thereof. The trustees were expressly authorized and directed, to collect all obligations that might arise or accrue in the conduct of the Trust. From these and other facts and circumstances, we think the intent of the settlor that the trustees might maintain such a suit is manifest. See 42 Tex.Jur. 779, 780 and 789; Connally v. Lyons, 82 Tex. 664, 18 S.W. 799, 27 Am.St.Rep. 935; Cavers v. Sioux O. & Ref. Co., Tex.Com.App., 39 S.W.2d 862; Canadian & American Mtg. & Trust Co. v. Edinburgh-American Land Mortg. Co., 16 Tex.Civ.App. 520, 41 S.W. 140; Id., 16 Tex.Civ.App. 520, 42 S.W.2d 864, writ refused. The beneficiary of a trust is not a necessary party to a suit by the trustees to recover trust funds and hold them for the beneficiary until such time as the trustees, under provision of the trust indenture, are authorized to deliver them to the beneficiary. Newhouse v. First Nat. Bank, D.C., 13 F.2d 887, 889, affirmed 7 Cir., 17 F.2d 228; Carey v. Brown, 92 U.S. 171, 23 L.Ed. 469; In re E. T. Kenney Co., D.C., 136 F. 451, 455; Hickox v. Elliott, C. C., 22 F. 13. Furthermore, the record shows that the beneficiary knew that the suit was prosecuted for its benefit by the trustees and acquiesced in such action by the Trustees. The beneficiary is therefore bound by the judgment. Lipsitz v. First Nat. Bank of Gordon, Tex.Com.App., 293 S.W. 563, 567. See also 26 R.C.L. 1341 and Neilon v. Texas Trust & Sec. Co., Tex.Civ.App., 147 S.W.2d 321, 328.

With reference to the question of limitation, our Supreme Court has said: " 'The doctrine is elementary that the statute of limitations does not run against an express trust until the trustee has done some act which shows repudiation of the trust, and which is brought to the knowledge of the cestui que trust.' " 42 Tex. Jur. 749. But, defendants say that this rule is applicable only where the trustee is in possession of the corpus of the Trust. Although the rule is, perhaps, most frequently applied in such cases, we do not think it is so limited. See Allen v. Pollard, 109 Tex. 536, 212 S.W. 468, and Costley v. Gracy, Tex.Civ.App., 52 S.W.2d 920. However, if we should assume that defendants' contention is correct, such assumption would not necessitate a change in our conclusion that plaintiff's cause of action is not barred by limitation. There is no testimony showing that either the trustees (other than defendants) or the beneficiary had knowledge or notice of any of the matters for which defendants are, in this opinion, held liable. There is no evidence that they had knowledge or notice prior to July 3, 1939, of any of the secret profits acquired by Slay, Simon or Sweatt. Suit was filed March 7, 1941. The record shows that said secret profits, acquired by said defendants in antagonism to the interests of the beneficiary, for which they

are held liable, were not only not fully disclosed, but, on the contrary, were concealed. The only matter relative to which there is evidence tending to raise an issue of either knowledge or notice is relative to a separate and distinct matter eliminated from the judgment, that is, fees for examination of the security and title thereto. There was no evidence of knowledge by the trustees or beneficiary of any fact putting them on notice of the secret profits collected and concealed. Under the circumstances the beneficiary was under no duty to check on the defendant trustees and attorneys to see if secret profits were being made by them. The language of Judge Taylor in Wichita Royalty Co. v. City Nat. Bank, 127 Tex. 158, 181, 89 S. W.2d 394, 406, is applicable here:

"The stockholders were without knowledge or notice of any fact that concealment was practiced upon them, and they were under no duty to check the conduct of Peckham, the Bank and Harrell. As expressed by Chief Justice Hickman * * * in reversing and rendering judgment for a principal in Security State Bank v. Burton, Tex.Civ.App., 10 S.W.2d 201, 204, writ of error refused:

" 'No such duty (to check up the conduct of an agent) rested upon appellant. It had the right to rely implicitly upon the good faith of its agent, and owed no duty whatever to investigate the acts of its agent, in order to determine whether such agent was truly representing it.'

"Certainly, this is true where, as here, there is no evidence that the cestuis had knowledge of any fact calculated to arouse inquiry on their part."

See also Eaton v. Husted, Tex.Civ.App., 163 S.W.2d 439, Tex.Sup., affirmed 172 S.W.2d 493; Allen v. Pollard, 109 Tex. 536, 538, 212 S.W. 468; Connally v. Lyons & Co., 82 Tex. 664, 18 S.W. 799, 27 Am. St.Rep. 935; Smith v. McElyea, 68 Tex. 70, 3 S.W. 258; Arrington v. McDaniel, Tex.Com.App., 14 S.W.2d 1009; and Fleishhacker v. Blum, 9 Cir., 109 F.2d 543. See also 42 Tex.Jur. 748, 749 and 754; 4 Bogart, Trusts and Trustees, § 951; Perry on Trusts, 7th Ed., p. 1468, 1469; Canadian & Am. Mtg. & Trust Co. v. Edinburgh-American Land Mtg. Co., 16 Tex.Civ.App. 520, 42 S.W.2d 864; Watson v. Dodson, Tex.Civ.App., 143 S.W. 329; First State Bank v. National Bank of Commerce, Tex. Civ.App., 99 S.W.2d 406; Leach v. Wilson County, 68 Tex. 353, 4 S.W. 613; Vol. 26

Texas Digest, Limitation of Actions, Davis v. Davis, 20 Tex.Civ.App. 310, 49 S.W. 726; Purchase v. Atlantic Safe Dep. & Tr. Co., 81 N.J.Eq. 344, 87 A. 444, 447; Restatement Law of Trusts, Sec. 200, Comment (d), p. 529; Grumbles v. Grumbles, 17 Tex. 472, 477; Burch v. McMillin, Tex.Civ.App., 15 S.W.2d 86, 91; Morrell v. Hamlett, Tex.Civ.App., 24 S.W.2d 531, 534, writ refused; Neyland v. Bendy, 69 Tex. 711, 713, 7 S.W. 497; Rice v. Ward, 92 Tex. 704, 708, 51 S.W. 844; 42 Tex.Jur. 751.

 Except as to the items hereinafter expressly enumerated in connection with the Big Indian judgment, we are of the opinion that the undisputed evidence shows that the trustees and attorneys, Slay, Simon, and Sweatt, in entering into the contracts of March 31, 1936, with the borrower, Proctor, Trustee, and in the divisions of the funds paid out by the Trust and in the receipt and division of the profits paid them by the Receiver, acted in violation of their duties to the Burnett Trust and in antagonism to its best interest, and were, as a matter of law, guilty of breaches of trust; that all such profits belong to the beneficiary and may be recovered by the plaintiff trustees. We further hold that the undisputed evidence shows that the other defendants knew of such breaches of trust and knowingly participated therein, and they are likewise liable therefor.

 "The Trustee is accountable * * * for any profit made through the use of the trust property, whether he uses it himself or receives payment from a third person for the privilege of using it. Similarly, if he receives a commission or bonus he is accountable for it even if he does not commit a breach of trust in receiving it." Scott on Trusts, Vol. 2, p. 1093, Sec. 203.

"Duty of Loyalty

"(1) The Trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.

* * * * * *

"Comment on Subsection (1):

"a. Fiduciary relation. A trustee is in a fiduciary relation to the beneficiary and * * * he is under a duty not to profit at the expense of the beneficiary and not to enter into competition with him without his consent, unless authorized to do so by the terms of the trust or by a proper court." Restatement of the Law of Trusts, p. 431, Sec. 170.

As to the particular items hereinafter named, we do not think the facts are conclusively established so as to make the defendants mentioned liable therefor as a matter of law. $5,000 of the money received by Slay and Simon on March 31, 1936, according to their testimony was received by them as attorneys fees paid by Proctor for their services in examining the title to units in the Big Indian Syndicate. Defendants testified that this fee was agreed upon by a contract separate, distinct and independent of all others and made prior thereto. A jury might conclude that a fee for such purpose was collected by Slay and Simon from the borrower with the knowledge and consent of the trustees and beneficiary. "A beneficiary who consents to an act or omission by the trustee which would constitute a breach of trust cannot hold him liable for the consequences of the act or omission, if the beneficiary was sui juris and had full knowledge of all relevant facts and of his legal rights and if his consent was not induced by any improper conduct of the trustees." Scott on Trusts, Vol. 2, p. 1149, sec. 216. We are further of the opinion that liability of Slay and Simon for $4,079, the unpaid principal on the Big Indian loan, is not conclusively established. The judgment on the Big Indian loan is therefore modified so as to deduct from the judgment rendered against Slay and Simon $9,079, and to deduct from the judgment against Proctor and Longmire the sums of $328.76 and $5,000, the $328.76 being the "discount" paid Slay and Simon on March 31, 1936, and the $5,000 being the amount of the fee paid Slay and Simon by Proctor on March 31, 1936, for examination of title to the security. As so modified, the judgment on the Big Indian transaction is affirmed.

Great Plains Oil and Gas Company Loan.

We shall not consider the judgment rendered in connection with the loan to the Great Plains Oil and Gas Company. The judgment with reference to this transaction necessarily rests upon the trial court's findings that the undisputed evidence shows breaches of trust by Slay and Sweatt as trustees and Slay and Simon as attorneys and knowing participation therein by the other defendants.

Plaintiffs allege that about April 18, 1936, Slay, Simon, Sweatt and Proctor procured from the Trust a loan of $200,000 to the Great Plains Company, then in receivership; that the loan was secured by a mortgage upon the properties of said company and that the debt was paid. Plaintiffs further allege that the beneficiary and present trustees first learned in the fall of 1940 that out of the proceeds of said loan Great Plains was required by Slay, Simon and Sweatt, as a condition precedent to the loan, to pay them $13,000 and in addition to give its note to Slay and Simon for $1,000, which was afterward paid to Slay and Simon, under the guise of attorney's fees, for their services in procuring the loan.

After careful investigation we are of the opinion that the evidence does not conclusively show that Slay and Simon required the payment of said sums out of the proceeds of the loan as a condition precedent to the loan. There is evidence, principally that of Simon, that Great Plains agreed to pay Slay and Simon a fee of $10,000 for examination of the title to its properties and for representing that company in its receivership suit; that this employment occurred before the matter of obtaining a loan from said Trust was mentioned; that said work was to be done by Slay and Simon and they were to be so paid therefor regardless of whether the loan was made; that Great Plains was financially able to pay and would have paid said fee if the loan had never been made.

Plaintiffs further allege that Slay and Simon kept the $1,000 for themselves and split the $13,000 "fee, bonus or commission" with Sweatt on the basis of one-third to Sweatt and two-third to Slay and Simon, paying Sweatt $4,333.33 and keeping $8,666.67; that Sweatt in turn split the $4,333.33 with Proctor "fifty-fifty", paying Proctor $2,166.67 and keeping $2,166.66. Plaintiffs also allege that, in addition to the sums heretofore mentioned, Great Plains was required to pay a commission of $19,100 to Proctor, who divided "fifty-fifty" with Sweatt; that Sweatt collected $9,550 from Proctor by drawing drafts on Proctor in the name of W. R. Adams; that the payment of $19,100 to Proctor and Sweatt was accompanied with much secrecy, and an attempt was made to conceal its payment as a "fee, bonus or commission." Facts were alleged showing the secrecy and attempted concealment alleged.

On the trial of the case Slay and Simon contended that the money paid them by the Great Plains Company was for legal services rendered in examining title to the security for the loan and representing that

company in its receivership suit. Plaintiffs alleged that, in the event Slay and Simon should make such a contention, nevertheless, their fees in connection with the Great Plains loan were so excessive and exorbitant that they amounted to "profits, fees, bonuses or commissions offered and paid them as an inducement for their vote and cooperation in procuring the loan and their withholding and concealing from the beneficiary the full and true facts and circumstances attending the making thereof * * *." In connection with this allegation, we again call attention to the testimony of Simon, hereinabove referred to. There was also testimony raising an issue of fact as to whether the fees charged were reasonable.

Plaintiffs alleged that Slay, Simon, and Proctor and the estate of Sweatt were liable and should be made to account to plaintiffs for the "secret profits, fees, bonuses or commissions paid and received as aforesaid". The testimony of Proctor and Sweatt shows that a Mr. Ford sent Mr. Cloud of the Great Plains, who handled the transaction for said company, to Proctor; that Proctor, in consideration of a commission of $30,000, less Cloud's expenses up to $10,000, agreed to put Cloud in touch with someone who would make the loan. According to Proctor, the only service rendered by him was to tell Cloud to go see Slay. However, the undisputed evidence shows that Cloud paid Proctor $19,000 for this service; that Proctor paid $100 to Ford and split the remaining $19,000 with Trustee Sweatt. It is further undisputed that Trustee Sweatt paid Proctor $2,166.- 67, exactly one-half of Sweatt's fee or commission paid by Cloud. Proctor testified that, so far as he knew, Slay and Simon did not know until this suit was filed that Sweatt and Proctor had obtained and split their commissions as aforesaid. Proctor testified that he informed Sweatt of his agreement with Cloud for a commission for obtaining the Great Plains loan; that to keep Slay and Simon from knowing he was getting a commission he had his check made payable to a third person.

According to Simon, Cloud came to Slay and Simon's office and told Simon he wanted to pay them the $10,000 attorney's fee theretofore agreed upon. Cloud said he also wanted to leave some money with Simon for some other parties; that he owed them around $5,000; that he wanted W. R. Adams to have some of this money; that

Cloud left with Simon $13,000 and gave Slay and Simon a note for $1,000, which was later paid. Simon testified that after this transaction with Cloud, Sweatt came to their office to get the money left there in the name of Adams; that Sweatt claimed $5,000, and that Slay and Simon's fee was $10,000; that Cloud had said he didn't have enough money to pay both; that Simon and Sweatt divided the $13,- 000, Sweatt taking one-third, that is, $4,- 333.33, and Slay and Simon retaining two-thirds, or $8,666.67. Slay and Simon later collected the $1,000 note and interest. Simon testified that he did not know that Cloud left any of this money for Sweatt or that Sweatt collected it. In view of the disposition we think is required of this part of the judgment, we do not think it necesesary to determine whether or not Slay and Simon are shown to be liable, as a matter of law, for the money delivered by them to Trustee Sweatt.

The trial court found (c) from the undisputed evidence that Sweatt and Slay and Simon, as a matter of law, breached their trust to the beneficiary in accepting the $14,000, received and divided by them in connection with the Great Plains loan; that Proctor had notice of such breaches of trust and participated therein; that Simon had notice of the breaches of trust by Slay and Sweatt and participated therein. (d) That Sweatt breached his trust to the beneficiary in accepting $9,550, one-half of Proctor's commission for obtaining the loan; that Proctor had notice of the breach of trust by Sweatt and participated therein by receiving $19,000 commission, and paying half of it to Trustee Sweatt.

It was decreed by the court (2) that plaintiffs recover from Slay, Simon, Proctor and Mrs. Sweatt, Independent Executrix, the sum of $14,000; (3) that plaintiffs recover from Proctor and Mrs. Sweatt, Independent Executrix, jointly and severally, the sum of $19,000, on the Great Plains transaction.

We are of the opinion that the undisputed evidence shows the liability of Proctor and Sweatt, as a matter of law, for the sum of $19,000 adjudged against said defendants in paragraph 3 of the judgment, that is, for the "commission" collected by Proctor and divided with Trustee Sweatt. But the evidence does not show, as a matter of law, the liability of Slay, Simon, Proctor and Sweatt for the sum of $14,- 000 adjudged against them on the Great

Plains transaction in paragraphs (c) and (2) of the judgment. With respect to said items, aggregating $14,000, collected by Slay and Simon and Sweatt, it is believed that the evidence raises questions of fact as to whether they were legitimate fees of the type habitually collected by them with the knowledge and consent or acquiescence, of the other trustees and the beneficiary. The judgment for said items, aggregating $14,000, insofar as it is against Slay, Simon and Proctor only is reversed. The judgment in the Great Plains transaction is otherwise affirmed.

### Proctor-Ward County Loan.

The court held (f) that plaintiffs were not entitled to recover against Slay and Simon on the W. C. Proctor-Ward County loan made by the Trust to Proctor on August 14, 1937. Plaintiffs do not complain of this portion of the judgment. The court rendered judgment on the Proctor-Ward County loan against Proctor and Sweatt for $143,730.98, recited in the judgment to be the past due and unpaid balance on Proctor's note to the Trust. Sweatt does not appeal. No reason is apparent why judgment was not properly rendered against Proctor for the unpaid balance of his note. The judgment on the Proctor-Ward County loan is affirmed.

### Lynch Loan.

Plaintiffs alleged that prior to August 14, 1937, Proctor submitted to the Trust a proposal for a loan of $200,000 to A. E. Lynch, to be secured by a lien on two leases in Ward County. That, unknown to the beneficiary, Lynch had agreed to pay and did pay Proctor $10,000 out of the proceeds of said loan, as a commission for procuring same; that Proctor had agreed with Slay, Simon and Sweatt to pay, and he did pay to them, and that Slay, Simon and Sweatt had agreed with Proctor to accept, and they did accept from Proctor, the sum of $7,500, in currency, for their services rendered in procuring said loan. That of the $7,500 paid by Proctor to Slay and Simon, Slay and Simon paid Sweatt $2500 and retained $5,000 for themselves; that said sums were paid to and received by said defendants as "fees, bonuses or commissions for their services in procuring the loan from Burnett Trust to Lynch, which loan would not have otherwise been made." Plaintiffs further alleged that Slay and Sweatt, Trustees, approved said loan and delivered to Lynch a check for $125,000,

dated August 14, 1937; that thereafter five $15,000 advances were made to Lynch to cover Lynch's expenses in drilling and equipping five additional wells on said leases.

Plaintiffs alleged that, pursuant to the agreement between the defendants, Lynch took the $10,000 cash out of the first check and paid it, in currency, to Slay, who previously had discussed with Proctor how much Slay and Simon were to get out of the $10,000, and agreed upon $5,000 as Slay and Simon's part. That Slay and Simon kept $5,000, and delivered $5,000 in currency to Proctor; that Proctor paid Sweatt $2500, by taking Sweatt's draft for $1500 on August 16, 1937, and by delivering to Sweatt on August 18, 1937, a check for $1,000. Plaintiffs alleged that said sums received by said parties represented Slay and Simon's fifty-per cent, Sweatt's 25 per cent and Proctor's 25 per cent interest "in the $10,000.00 fee, bonus, or commission paid by Lynch in order to secure said loan from Burnett Trust." Plaintiffs alleged that Lynch had assigned the leases to Tex-Oil and that Tex-Oil had transferred said leases and the personal property thereon to plaintiffs, who are now the owners thereof. That as of December 31, 1941, the principal and interest owing on said loan was $202,956.10; that the leases and personal property transferred to the plaintiffs did not have a reasonable value in excess of $25,000.

Plaintiffs charged that in accepting the money received by them out of the proceeds of the Lynch loan, Slay, Simon and Sweatt failed to execute their respective trusts with fidelity, but, in breach of their trust and fiduciary duties, received said sums of money "as fees, bonuses or commissions for their services rendered in connection with the procurement of the loan * * * and said loan would not have been made had not such sums of money been paid * * *." That the breaches of trust on the part of Slay, Simon and Sweatt were known, or could have been known by the exercise of ordinary diligence by Proctor, who participated with them in said disloyal acts by aiding and abetting in the accomplishment of their unlawful purposes and sharing in the profits derived therefrom. That Slay and Simon and Sweatt failed to execute their trusts with fidelity by failing to make a full disclosure to the beneficiary of the facts alleged.

500

Plaintiffs charged that in the event Slay and Simon claimed that the money received by them in connection with the Lynch loan was received by them as attorneys' fees "in connection with their services as attorneys in examining title, drafting loan papers and performing such other work as may have been incidental to the loan, plaintiffs aver that such fees were so much more than those usually and customarily paid for such work in the city of Fort Worth, * * * as to be excessive and exorbitant to the extent that they amounted to profits, fees, bonuses, or commissions offered and paid them as an inducement for their vote and cooperation in procuring the loan and their withholding and concealing from the beneficiary the full and true facts * * *." Plaintiffs alleged that because Slay, Simon and Proctor failed to make full disclosure to the beneficiary of the foregoing facts and because of the reliance by the beneficiary and the confidence it had in Slay, Simon and Sweatt, said beneficiary did not learn in part until the summer of 1940, and in full until the spring of 1941, and could not have learned earlier by the exercise of ordinary diligence of the facts alleged. That Slay and Sweatt committed breaches of trust and Simon and Proctor knowingly participated therein. That as a result plaintiffs sustained a loss on the Lynch loan of $178,000, for which said defendants were jointly and severally liable.

The court found from the undisputed evidence that Slay, Simon and Sweatt breached their trust to the beneficiary in accepting $10,000, received and divided by them in the Lynch loan; that Proctor had notice of such breaches and participated therein; that Simon had notice of the breaches of trust of Slay and Sweatt and participated therein; that Burnett Trust sustained a loss of $136,288.71 on the Lynch loan. The Court arrived at the amount of the loss by taking from the balance of principal due, to wit, $186,288.71, the sum of $50,000, stated in the judgment to be the highest valuation placed on the leases by any witness. Judgment was accordingly rendered against Slay, Simon, Proctor and Mrs. Sweatt, Independent Executrix, for the sums of $10,000 and $136,288.71.

It must be remembered that to sustain the findings of the eminent trial judge which constitute the basis for the judgment, the evidence must be such that reasonable minds cannot differ as to the material conclusions to be drawn there-

from. We think the evidence raises issues of fact as to knowledge and acquiescence in the collection of fees for examining the title and investigating the securities by Sweatt and Slay and Simon. This conclusion requires reversal of the judgment for $10,000. We are further of the opinion that the evidence raises an issue of fact as to the loss, or amount of the loss, sustained in this transaction. The court subtracted from the unpaid balance of principal owing on this loan, $50,000. This was, as the court found, the highest valuation placed on the security by any witness. However, testimony as to the value of the leases transferred to plaintiffs consists of opinions of expert witnesses. The opinions of such witnesses are not conclusive as to the valuation of said property. They merely raise an issue of fact. Crow v. Thompson, Tex.Civ.App., 131 S.W.2d 1064, writ dismissed; Texas Employers' Ins. Ass'n v. Humphrey, 140 S.W.2d 313, writ refused; Blackburn v. Blackburn, Tex.Civ.App., 163 S.W.2d 251; Simmonds v. St. Louis, B. & M. R. Co., 127 Tex. 23, 91 S.W.2d 332; Guinn v. Coates, Tex.Civ. App., 67 S.W.2d 621.

The judgment on the Lynch loan as to Slay, Simon and Proctor is reversed and the cause remanded. The judgment against the Estate of Sweatt is undisturbed.

Tex-Oil Producers, Inc., Loan.

After the loan had been made to Lynch on the security of two oil and gas leases in Ward County and after Lynch had transferred the leases, about July 7, 1939, Tex-Oil Producers, Inc., of which Lynch was president, procured a commitment from the Trust for a loan of $125,000. Tex-Oil assigned to the Trust, as security for this loan as well as for the loan theretofore made to Lynch the interest owned by Tex-Oil in its "Bean" lease in Oklahoma. About July 7th, 1939, the Burnett Trust made an advance on this loan of $82,000. Slay, Simon and Sweatt obtained out of this advance about $10,000. Thereafter, in August, 1939, the Trust made additional advances on this loan of $5,590.53 and $6,960.02. In December, 1939, a Receiver for Tex-Oil was appointed in Oklahoma. Out of the $10,000 heretofore mentioned Slay and Simon retained $6,500, Sweatt $3,250, and Slay and Simon paid to a firm of Oklahoma lawyers who assisted in examination of the title to the security the sum of $250. Slay, Simon and Sweatt were charged with having breached

their trusts in receiving said sums and with liability for an alleged loss on the Tex-Oil loan of $103,604.84. From the undisputed evidence the Court found that Slay, Simon and Sweatt breached their trusts in accepting $9,750, received and divided by them in the Tex-Oil loan, being the $10,000 received by them, less the $250 paid to the Oklahoma lawyers. That Simon had notice of such breaches of trust by Slay and Sweatt, and participated therein; that the Trust sustained a loss of $92,432.11. Judgment was rendered against said defendants, jointly and severally, for said sums.

The same legal situation is presented here as in the Lynch loan and the same decision is required. There was testimony by Slay that Slay and Simon were paid a fee of $6,500 for examining the title to the security for said loan and that said fee was to be paid in any event, that is, it was not contingent. We think the evidence raises an issue of fact that the collection of an attorney's fee by Slay and Simon for examination of the title to the security for the loan was known to and acquiesced in by the other trustees and the beneficiary. The evidence as to such matters relative to this, as well as the other loans, does not indicate that either the other trustees or the beneficiary knew the amount of the fees charged the borrowers for examining titles to the securities offered the Trust for loans, but the testimony is sufficient, we think, to raise the issue that they knew of and acquiesced in the custom of Slay and Simon of collecting fees for examination of the title to the security for the loan from the borrower. Furthermore, it is not conclusively established that such fees were so exorbitant as to constitute, as a matter of law, a payment to Slay and Simon for their assistance to the borrower in procuring a loan from the Trust, as charged by the Plaintiffs. There is evidence that the fees charged were reasonable. The evidence as to the loss is not conclusive. The judgment on the Tex-Oil loan is reversed as to Slay and Simon. The judgment as to Sweatt is undisturbed.

### Public Service Corporation Loan.

About September 4, 1937, the Trust loaned Public Service Corporation $275,000. This loan was refinanced by a bank and paid in full. The borrower also paid the Trust a bonus of $2,500 for permission to refinance the loan and pay its debt before maturity. From the undisputed evidence the Court found that Sweatt and Slay and Simon breached their trust to the beneficiary in accepting $25,000, received and divided by them about September 4, 1937; that Simon had notice of such breaches of trust by Slay and Sweatt and participated therein. Judgment was rendered against Slay and Simon and Sweatt's estate for $25,000.

After the money was paid by the Trust to Mr. Horwitz for the Public Service Corporation, Horwitz promptly delivered to Simon a check for $1,500 payable to Slay and Simon. At the same time he also delivered to Simon a check for $23,500 payable to W. R. Adams. Simon delivered the $23,500 Adams check to Sweatt. Thereafter, Sweatt paid to Slay and Simon on different dates in September, 1937, $7,600 and $7,500. Sweatt kept for himself $8,400. Simon testified that he asked Horwitz to deliver the $23,500 check, payable to Adams, to him (Simon) and that Horwitz did so. Simon said that the reason he asked Horwitz to deliver the $23,500 check to him was that Sweatt had asked him to have it done that way; that he "understood" that the payee Adams was Sweatt's partner. Simon testified that Sweatt came to his office and got the Adams check. Simon was asked by his counsel whether there was anything said between him and Horwitz at the time Horwitz delivered the $23,500 Adams check to Simon about whether Slay and Simon were to get part of the check. Simon answered "Yes", and further: "I told Mr. Horwitz at the time that since he was my client and the Burnett Trust was also our client that I could not take any part of that check, but that I might get some of it and take it *as a part of any commissions,* or anything of that sort, that was being paid by the Public Service Corporation, but that if I got any of it I would apply upon his rate case that we then had pending." Simon further testified: "Did you or your firm receive anything on your services in these rate cases for Public Service Corporation? A. No, sir. We have never received a dollar yet *except the money that was paid to us out of the money that came from the commission in the Burnett Trust. We have received that, yes, sir."* Simon further testified: "Q. How did Mr. Sweatt come to give you any part of that $23,500.00? A. I don't know. I can't tell exactly why, unless he just thought we were entitled to it because *he was getting it* and a Mr.

502

Adams, I did not know what arrangement they had, but they had been—he had gotten some money out of some matters that we did for services that he had performed and I assume that was the thing that was behind his giving us the money." (Italics ours.)

The above, and other testimony of like import, came from Simon in response to questions by his own counsel. See Kimmell v. Tipton, Tex.Civ.App., 142 S.W.2d 421, 429. The books of Slay and Simon show the $15,100, received from Sweatt, as cash fees received on September 18th and 29th. Their books do not show from whom these two payments were received nor for what they were paid. It will be remembered that in the Big Indian Transaction that both Slay and Simon admitted that they learned in July, 1936, that "W. R. Adams" was merely an alias for Trustee Sweatt. Therefore, their own testimony clearly shows that when they received the money in this transaction they knew "Adams" was Trustee Sweatt. The testimony of Simon clearly shows that they assisted in the collection of an illegal commission paid for obtaining this loan from the Trust and that Slay and Simon knew that the check for $23,-500, payable to Adams, was a commission for obtaining the loan; that when they assisted in the collection of the commission for Sweatt, or for Sweatt and his supposed partner, Adams, they then expected to obtain a part of the proceeds of said check for themselves and that they thereafter did obtain two-thirds of the amount of the check from Trustee Sweatt. It is true that Simon testified that two-thirds of the amount of the commission, illegally collected by Sweatt through Slay and Simon, was received back by Slay and Simon as an advance payment on a fee for representing Public Service Corporation in some rate cases pending in Austin. They do not contend that their books actually show such a credit. However, we must assume, under the circumstances surrounding the rendition of this judgment, that the $15,100 was collected by Slay and Simon from Sweatt for the purpose of applying it as a credit on their fee in the rate cases. We are of the opinion that this assumption does not materially affect the necessary legal conclusion to be drawn from said defendant's testimony. Slay and Simon admittedly, at all times material in this transaction, were the attorneys for both the Public Service Corporation and the Burnett Trust. Simon's testimony is to the effect that he was the first to suggest to the borrower that it could get a loan from the Trust and that he recommended to Trustees Slay and Sweatt that the loan be made. Slay and Simon were required to look after the best interests of both of said clients at the same time. They cannot be permitted to take advantage of their client's situation for their own benefit, nor to put themselves in a position where their personal interests conflicted with their duties to their clients. There is no contention that a full disclosure of the facts surrounding this transaction was made to the other trustees or to the beneficiary. Accepting their testimony as true, it clearly discloses that they were guilty of breaches of trust and participated in the breaches of trust by Trustee Sweatt in assisting Sweatt in the collection of an illegal commission and in knowingly receiving back from Sweatt two-thirds of the commission paid to obtain the loan from the Trust. We think this conclusion is required, regardless of whether the two-thirds of Sweatt's commission was applied by Slay and Simon to payment of a fee in the rate cases.

"The testimony of a party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact." Southern Surety Co. v. Inabnit, Tex.Civ.App., 1 S.W.2d 412, 415. See also Kimmell v. Tipton, Tex.Civ.App., 142 S.W.2d 421, 428 and Wristen v. Wristen, Tex.Civ.App., 119 S. W.2d 1104, 1108. The admissions of Slay and Simon in connection with this transaction and the Big Indian loan unquestionably disclose a breach of trust under the decision of our Supreme Court in Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509.

We here call attention to the fact that when Slay and Simon appeared before the new trustees for the purpose of explaining the fees collected by them in connection with loans by the Trust that, according to Simon, they knew that the new trustees did not know about the fees collected by Slay and Simon in this transaction and Slay and Simon did not tell the trustees that they had collected anything.

The evidence with reference to the receipt of a check for $1,500 from the borrower raises issues of fact as to whether it was legitimate attorneys' fees col-

lected from the borrower for examining the title to the security with the knowledge and consent of the other trustees and the beneficiary. The judgment in the Public Service Transaction, as against Slay and Simon only, is modified by reducing it from $25,000 to $23,500, and as so modified it is affirmed.

### Longmire Loan.
### Nantz-Wood Loan.

 Judgment was rendered against Slay, Simon, Longmire and Mrs. Sweatt, Independent Executrix, in connection with the loan by the Trust to Ray E. Longmire. Judgment was also rendered against Slay, Simon and Mrs. Sweatt, Independent Executrix, in connection with the Nantz-Wood loan. The judgment on each of said loans is reversed, except as against the estate of Sweatt. We are of the opinion that there are questions of fact to be determined relative to each of said transactions. In the Longmire loan the value of the security credited on the debt, thus arriving at the amount of loss, is an issue of fact. It was not conclusively established by the opinions of expert witnesses.

 In the Longmire transaction, as in several others, judgment was rendered for an alleged "loss" sustained by the Trust. The fact of a loss, as well as the amount, was arrived at by deducting the value of the security from the unpaid balance of the borrower's debt to the Trust. In each instance the value of the security was determined by taking the highest valuation placed thereon by any witness. These witnesses were experts. There was evidence as to the productivity of some of this oil land, as to the valuation of adjacent property, as to whether water could be shut off, as to the probability of production from a different strata and other testimony of like import. In the Longmire transaction the borrower conveyed his mineral interests to the Trust when the loan was made. The conveyance was intended as a mortgage, but Longmire could not regain his property until his debt was paid. Jasper State Bank v. Braswell, 130 Tex. 549, 111 S.W.2d 1079, 115 A.L.R. 329. The basis for the court's conclusion in each instance was the opinions of expert witnesses. The opinions of expert witnesses as to the value of oil land, royalty or mineral interest is not conclusive. The weight of opinion evidence as to value is for the determination of a jury, or other trier of the facts, in the light of their own knowledge and experience as well as that of such witnesses. A jury is not bound by either the minimum or maximum valuation placed on the property by the opinions of experts witnesses. Simmonds v. St. Louis, B. & M. R. Co., 127 Tex. 23, 30, 91 S.W.2d 332, and cases cited therein; Blackburn v. Blackburn, Tex.Civ.App., 163 S.W.2d 251, 256; Texas Emp. Ins. Ass'n v. Humphrey, Tex.Civ.App., 140 S.W.2d 313, 316, writ refused; Crow v. Thompson, 131 S.W.2d 1064, 1069, writ dismissed; Federal Underwriters Exchange v. Pugh, Tex.Civ.App., 176 S.W.2d 761, 762; Octane Oil Ref. Co. v. Blankenship-Antilley Implement Co., Tex.Civ.App., 117 S.W.2d 885, 886; Trevino v. American Nat. Ins. Co., 140 Tex. 500, 506, 168 S.W.2d 656; Scott v. Gardner, 137 Tex. 628, 634, 156 S.W.2d 513, 141 A.L.R. 50; 32 C.J.S., Evidence, § 567, 568, pp. 378, 385, and 20 Amer.Jur. 757.

On the Nantz-Wood loan, as in some of the other loans heretofore mentioned, questions of fact which determine the legality of the fees collected by Slay and Simon were not conclusively established. There was evidence from which a jury might conclude that the fees collected by Slay and Simon were reasonable attorneys fees for the examination of titles collected from the borrower with the knowledge and consent of the other trustees and the beneficiary.

There are portions of the judgment with reference to other loans not mentioned wherein plaintiffs were denied recovery. The judgment in this respect is not assailed and is affirmed. All of the defendants' (appellants') points not herein sustained are overruled. The judgment is in part affirmed, in part modified and affirmed, and in other parts reversed and remanded, as hereinbefore shown relative to each transaction.